5 P.3d 668 (2000)
141 Wash.2d 373
STATE of Washington, Respondent
v.
Loreal Monique KINZY, Petitioner.
No. 68239-9.
Supreme Court of Washington, En Banc.
Argued March 1, 2000.
Decided July 27, 2000.
As Corrected August 22, 2000.
*670 Perkins, Coie, Kevin C. Osborn, Seattle, for Amicus Curiae on Behalf of American Civil Liberties Union.
Nana M. Nelson, Seattle, for Petitioner.
Norm Maleng, King County Prosecutor, Ann Marie Summers, Deputy King County Prosecutor, Seattle, for Respondent.
*669 SMITH, J.
Petitioner Loreal Monique Kinzy seeks review of a decision of the Court of Appeals, Division I, which affirmed her conviction in the King County Superior Court, Juvenile Division, for possession of cocaine in violation of the Uniform Controlled Substances Act under RCW 69.50.401(d) and an order denying her motion to suppress evidence of cocaine.[1] The Court of Appeals concluded the cocaine was not the fruit of an illegal "search and seizure" because Respondent, acting under its community caretaking function, was lawfully entitled to "seize" Petitioner, a 16-year-old minor.[2] This Court granted review. We reverse.

QUESTION PRESENTED
The question presented in this case is whether, under the Fourth Amendment to the United States Constitution, the "community caretaking function" exception permits police officers to lawfully "seize" a 16-year-old minor without a warrant when the officers have no reason to believe the minor has committed a criminal offense, but the minor is standing on a public sidewalk in a high narcotics trafficking area on a school night with several others, including an older person believed by the officers to be associated with narcotics.

STATEMENT OF FACTS
Petitioner Loreal Monique Kinzy, a minor born May 2, 1981, was charged by information in the Juvenile Department of the King County Superior Court on March 6, 1998 with possession of cocaine in violation of the Uniform Controlled Substances Act under RCW 69.50.401(d).[3] During a fact-finding hearing on May 7, 1998, Petitioner filed a motion to suppress evidence of cocaine.[4] The Honorable Liem E. Tuai, judge pro tempore, denied the motion and on July 30, 1998 signed "Written Findings of Fact and Conclusions of Law to Comply with CrR 3.6," which recited:[5]
I. THE UNDISPUTED FACTS:
1. On [Tuesday] March 3, 1998, Seattle Police Officers M.B. Jennings and D.K. Kim were working as uniformed bicycle patrol officers. At 2210 hours (10:10 p.m.) the officers encountered [Ms. Loreal Monique Kinzy] at the NorthWest [sic] corner of Third Avenue and Stewart Street in downtown Seattle. It was a school night. *671 This area is known to the officers as a high narcotics trafficking area. [Ms. Kinzy] appeared to the officers to be between 11 and 13 years old. [She] was in the company of two other girls and an older male. The older male was familiar to the officers due to previous narcotics contacts.
2. When the officers hailed [Ms. Kinzy], she put her head down and continued to walk away. [She] was restrained by the officers and asked her age and name. At some point in time [Ms. Kinzy] told the officers that she was 16 years old. The officers did not believe that [she] was 16 due to her very youthful appearance. [Ms. Kinzy] acted nervous and kept putting her hands into her coat. She was patted down for weapons by Officer Jennings.
3. Officer [sic] felt a hard object in [Ms. Kinzy's] coat. When it was examined it turned out to be a comb/brush. Officer Jennings had [Ms. Kinzy] keep her coat open after discovering the comb, again for officer safety.
4. Officer Jennings saw what he suspected to be white/creme flecks of rock cocaine on the black lining of [Ms. Kinzy's] coat.
5. This suspicion was based on the officers [sic] experience with narcotics and his many narcotics related arrests.
6. Officer Jennings testified that the flecks were not "lint' [sic] nor crumbs of food. By color and consistency, Officer Jennings identified the flecks as being possible rock cocaine.
7. The flecks field tested positive for cocaine.
8. Officer[s] Jennings and Kim testified that they perceived [Ms. Kinzy] to be a "youth at risk" when they approached her.
9. Because of the high drug area, the hour, the fact that it was a school night, that [Ms. Kinzy] appeared so young in age, and due to one of her companions being associated with narcotics, [Ms. Kinzy] stood out.
10. After the field test came back positive for cocaine, [Ms. Kinzy] admitted she had more cocaine in her "bra."
11. After Miranda and arrest, additional cocaine was recovered from [Ms. Kinzy's] "bra" when she was searched by Officer Kim at the SPD West Precinct.
II. REASONS FOR THE ADMISSIBILITY OF THE EVIDENCE SOUGHT TO BE SUPPRESSED:
1. The court finds that the Officers had a reasonable basis for approaching and questioning [Ms. Kinzy] to determine her age and whether she [sic] a youth at risk.
2. The court finds that due to [Ms. Kinzy's] perceived height of 4'9" (verified as 5'1" at fact finding), perceived age of between 11 and 13, the late hour, her presence in a high narcotics area, the fact that she was in the company of a person associated with narcotics, all added to provide the officers with proper grounds to approach [Ms. Kinzy] as a youth at risk.
3. The court finds that due to her furtive movements, bulky clothing and refusal to keep her hands in view, there was a reasonable and grounded concern for officer safety which prompts and justifies a pat-down for weapons.
4. The court finds that Officer Jennings acted reasonably when he requested [Ms. Kinzy] to keep her jacket open so he could see where her hands were.
5. The court finds that the Officers were lawfully engaging [Ms. Kinzy] based on their concerns for her safety as a potential youth at risk.
6. The court finds that [O]fficer Jennings saw, in plain view, what he thought to be particles of rock cocaine on the black lining of [Ms. Kinzy's] coat.
7. The court finds that Officer Jennings could differentiate between the suspected narcotics and other items such as lint or food crumbs because of his experience, both on the street and formal training, in the area of narcotics.
8. Relevant factors considered by the court, were taken in light of the circumstances at hand and the officers [sic] training and experience.
9. The court finds the testimony of the officers credible.

*672 In addition to the above-written findings and conclusions, the Court incorporates by reference its oral findings and conclusions.[[6]]
Officer M.B. Jennings testified on direct and cross examination consistent with the written findings of fact:
A. I approached and we stopped and said, you know: Could you come here. She ignored us. We talked directly to her and said, you know: Young lady, could you please stop and come here. And she kept her hand [sic] down with her hands in her pockets and attempted to walk away. The rest of the group stopped. She was the only one that continued to walk away from us.
. . . .
Q. Did she ever stop walking?
A. We actually had to hold her arm to stop her from walking.

Q. Well, what did you ask her, what questions?
A. At that point we wanted to identify her. She looked young. We wanted to find out how old she was and to do a check for her safety and question her why she was downtown, what her purpose was, who she was with, was she with family, was she by herself, does she know these people, those kind of questions.
Q. Did you have any suspicions of drug activity regarding her?

A. Regarding her, no. We stopped her for her safety.

. . . .
Q. So your initial reason for contacting Loreal was not because you suspected her of any criminal activity; is that correct?

A. That's correct.

. . . .
Q. If she were to say to you: I'm 16, I'm fine, I don't need your help, would that have been sufficient for you to let her go?

A. No.

Q. So you wanted very specific details about her plans?

A. No, I wanted proof of her age. Because of her visual appearance, she did not look to be 16 years old.[[7]]
After hearing further testimony, Judge Tuai on May 7, 1998 found Petitioner "guilty" of violation of the Uniform Controlled Substances Act under RCW 69.50.401(d).[8] During a disposition hearing on June 4, 1998, the Honorable Deborah D. Fleck imposed upon Petitioner a "manifest injustice" sentence of 32 weeks.[9] Petitioner on that date filed a notice of appeal to the Court of Appeals, Division I.[10]
The Court of Appeals, Division I, the Honorable Susan R. Agid writing, in a majority opinion affirmed Petitioner's conviction and the order denying her motion to suppress evidence of cocaine.[11] Petitioner claimed the cocaine was the fruit of an illegal search and seizure.[12] The court disagreed and concluded that (1) the initial "seizure" of Petitioner was reasonable under the "community caretaking function" exception to the warrant requirement, (2) the protective frisk of Petitioner was valid under Terry v. Ohio[13] and *673 (3) the plain view observation and simultaneous "seizure" of cocaine flecks was valid under the "plain view" exception to the warrant requirement.[14]
Petitioner then sought review in this Court. In her supplemental brief and petition for review, she raised only the issue of the validity of her "seizure" under the community caretaking function exception.[15] Review was granted on November 2, 1999.[16]

DISCUSSION

STANDARD OF REVIEW
On May 7, 1998, Petitioner filed in the King County Superior Court, Juvenile Division, a motion to suppress evidence of cocaine. The court denied the motion and on July 30, 1998 signed findings of fact and conclusions of law to comply with CrR 3.6. "[I]n reviewing findings of fact entered under a motion to suppress, [this Court] will review only those facts to which error has been assigned."[17] Petitioner did not challenge the findings of fact on appeal to this Court.[18] We must then treat them as verities.[19]
The findings of fact provide a chronology of five significant events on March 3, 1998, the date of Petitioner's arrest. First, Seattle Police Officers M.B. Jennings and D.K. Kim observed Petitioner in company with several others at 10:10 p.m., decided to approach her and then "hailed" her.[20] The record does not indicate the actual time of following events, but it is clear they followed instantaneously in sequence immediately after 10:10 p.m. Second, Officer Jennings grabbed Petitioner's arm as she began to walk away.[21] Third, he patted Petitioner down for weapons.[22] Fourth, Officer Jennings noticed cocaine flecks on Petitioner's coat and removed them for field testing.[23] Fifth, Petitioner "admitted" she had more cocaine in her brassière after "the field test came back positive for cocaine."[24]
*674
 TIME SEQUENCE OF EVENTS
10:10 p.m. 1 INITIAL OBSERVATION AND DECISION TO
 APPROACH PETITIONER
10:10 p.m. plus 2 OFFICER JENNINGS GRABBED PETITIONER'S
 ARM AS SHE WALKED AWAY
10:10 p.m. plus 3 PAT-DOWN FRISK OF PETITIONER BY OFFICER
 JENNINGS
10:10 p.m. plus 4 REMOVAL OF COCAINE FLECKS FROM
 PETITIONER'S COAT BY OFFICER JENNINGS AND
 FIELD TEST OF FLECK
10:10 p.m. plus 5 ACKNOWLEDGEMENT BY PETITIONER THAT SHE
 HAD A BAG OF COCAINE IN HER BRASSIÈRE

Figure 1. Sequence of Events
Petitioner does not challenge the validity of the pat-down frisk, which the Court of Appeals concluded was reasonably "based on `specific and articulable facts' ... that [Petitioner was] `armed and presently dangerous.'"[25] Neither does she challenge the removal of cocaine flecks, which the Court of Appeals concluded came within the simultaneous "plain view" exception to the warrant requirement.[26] Nor does she challenge the validity of her admission concerning the bag of cocaine in her brassière.[27] Petitioner instead relies solely upon the "fruit of the poisonous tree" doctrine.[28] She claims the sequence of events beginning with the officer grabbing her arm were unconstitutional and thus tainted everything that followed, including especially "seizure" of the bag of cocaine from her brassière.[29]

FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION
"As a general rule, warrantless searches and seizures are per se unreasonable" under the Fourth Amendment to the United States Constitution.[30] "Nonetheless, there are a few jealously and carefully drawn exceptions to the warrant requirement which provide for those cases where the societal costs of obtaining a warrant ... outweigh the reasons for prior recourse to a neutral magistrate."[31] The State bears the burden of *675 showing a seizure without a warrant falls within one of these exceptions.[32]
The sole issue before this Court involves the further question whether one of these carefully drawn exceptions applies to the two events occurring prior to the pat-down frisk.[33] Under Terry v. Ohio, police officers need not have a warrant to "stop" a suspect if they have "a reasonable, articulable suspicion that criminal activity is afoot."[34]
In this case, the findings of fact do not support justification for a Terry stop because the first two sequential events of March 3, 1998 provide no indication of criminal activity by Petitioner. Indeed, Officer Jennings testified his reason for initiating contact with Petitioner was simply concern for her safety and not suspicion of criminal activity.[35] Because Respondent State of Washington cannot establish a valid Terry stop, it relies instead upon the "community caretaking function" exception to the warrant requirement.

"COMMUNITY CARETAKING FUNCTION" EXCEPTION
The community caretaking function exception was first announced in Cady v. Dombrowski, which observed with respect to the Fourth Amendment of the United States Constitution that
Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.[[36]]
As noted in Cady, the community caretaking function exception is totally divorced from a criminal investigation.[37]
This Court first cited Cady in State v. Houser, a 1980 case involving impoundment of an automobile.[38] Subsequent Washington cases have expanded the community caretaking function exception to encompass not only the "search and seizure" of automobiles, but also situations involving either emergency aid[39] or routine checks on *676 health and safety.[40] Both situations may require police officers to render aid or assistance.[41] But compared with routine checks on health and safety, the emergency aid function involves circumstances of greater urgency and searches resulting in greater intrusion.[42] It applies when "(1) the officer subjectively believed that someone likely needed assistance for health or safety reasons; (2) a reasonable person in the same situation would similarly believe that there was a need for assistance; and (3) there was a reasonable basis to associate the need for assistance with the place searched."[43]
The community caretaking function exception recognizes that a person may encounter police officers in situations involving not only emergency aid, but also involving a routine check on health and safety. In Kalmas v. Wagner, this Court concluded the exception applied when one of the parties "called 911 asking for police assistance."[44] Under a routine check on safety, "[w]hether an encounter made for noncriminal, noninvestigatory purposes is reasonable depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a `community caretaking function.'"[45]
Because this Court has not rendered any pertinent decision directly applicable to the principal issue in this case, we may consider some decisions of the Court of Appeals. If a person has not been "seized," balancing the interests usually results in favoring the action by police. The person's interest in being free from police intrusion is "minimal" in the absence of a "seizure."[46] In contrast, "[m]any citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid."[47] Considering the public's interest in having police officers perform community caretaking functions, "police officers must be able to approach citizens and permissively inquire as to whether they will answer questions."[48]
When a person has been seized, balancing the interests does not necessarily favor an encounter by police. "A person is `seized' within the meaning of the Fourth Amendment of the United States Constitution only when restrained by means of physical force or a show of authority."[49] The relevant inquiry is whether totality of the circumstances indicate "a reasonable person would have felt free to leave or otherwise decline the officer's requests and terminate the encounter."[50] Consistent with this inquiry, a citizen's interest in being free from police intrusion is no longer minimal once there is a seizure. When weighing the public's interest, this Court must cautiously apply *677 the community caretaking function exception because of "a real risk of abuse in allowing even well-intentioned stops to assist."[51] Once the exception does apply, police officers may conduct a noncriminal investigation so long as it is necessary and strictly relevant to performance of the community caretaking function.[52] The noncriminal investigation must end when reasons for initiating an encounter are fully dispelled.[53]
In this case, the first event at 10:10 p.m. was the starting point of a pre-seizure encounter, albeit a brief one. Officers Jennings and Kim observed Petitioner, decided to approach her and then hailed her. Their decision, based on good intentions, was supported by (1) their perception and erroneous belief that Petitioner was between the ages of 11 and 13; (2) the late hour of 10:10 p.m. on Tuesday, March 3, 1998; (3) her presence in a high narcotics trafficking area on the corner of Third Avenue and Stewart Street in downtown Seattle; and (4) the fact she was in the company of several persons, including one adult male person known by the officers to be associated with narcotics.
The officers testified the encounter was initiated by their concern for Petitioner's safety as a potential youth at risk. The public interest without question comports with increasing the safety of children, especially those considered "at-risk youth."[54]
The record does not support justification for detaining Petitioner under the Family Reconciliation Act[55] which clearly is designed to promote the public interest in the safety of children. In addition, rendering aid or assistance through a health and safety check is a hallmark of the community caretaking function exception. Otherwise a police "officer could be considered derelict by not acting promptly to ascertain if someone needed help."[56] In contrast, Petitioner's interest in freedom from police intrusion was minimal as long as there was no seizure. Balancing the interests indicates the pre-seizure encounter was reasonable and justified under the community caretaking function exception.
*678
TIME SEQUENCE OF EVENTS
 PERMISSIBLE POLICE ACTION
10:10 p.m. 1 INITIAL OBSERVATION AND DECISION TO
 APPROACH PETITIONER
 State's interest in child safety based
 Petitioner's interest in freedom from upon Petitioner's perceived age and
 police intrusion is minimal height, the late hour, her presence in
 because there is no seizure. a high narcotics trafficking area and
 association with a narcotics trafficker.

Figure 2. Permissible Police Action
Petitioner, however, did not welcome the pre-seizure encounter with police officers. She began to walk away. The officers not then suspecting she had committed a crime, Petitioner should have been able to walk away and terminate the encounter.[57] She instead "was restrained by the officers."[58] This restraint initially might conceivably be considered a continuation of the previous event of observing Petitioner and deciding to approach her. The balancing test nonetheless must be applied again because there was a change in Petitioner's interest in freedom from police intrusion.
The second eventthe officer grabbing Petitioner by the armraised the encounter to the level of a "seizure" without a warrant.[59] Her interest in being free from police intrusion was no longer minimal. Officer Jennings testified he "wanted to find out how old [Petitioner] was ... and question her why she was downtown, what her purpose was, who she was with, was she with family, was she by herself, does she know these people...."[60] When asked her age, Petitioner truthfully told the officers she was 16 years old. Her honest answer was met with momentary disbelief and further police intrusion by demand for identification and proof of age. Officer Jennings testified he would not have released Petitioner even though she said she was 16 and even if she had said she was not in need of help.
Counterbalancing Petitioner's substantial interest in freedom from police intrusion is the public's interest in the safety of children. When weighing the public's interest, this Court must cautiously apply the community caretaking function exception because of the potential for abuse. The findings of fact indicate the police officers relied upon the following subjective and objective facts: (1) Petitioner's perceived age of between 11 and 13; (2) the late hour beyond 10:10 p.m. on Tuesday, March 3, 1998; (3) her presence in a high narcotics area on the corner of Third Avenue and Stewart Street in downtown Seattle; and (4) the fact she was in the company *679 of a person known by the officers to be associated with narcotics. The actions by the officers were suggestive of enforcement of a juvenile curfew law. But Seattle does not have such a law.
It is at least subject to question whether juvenile curfew laws impermissibly infringe upon a minor's constitutional freedoms of association, expression and movement.[61] Consideration of these freedoms in this case, after cautious application of the community caretaking function exception, leads us to conclude the seizure of Petitioner Kinzy by the officers and their actions which followed was unreasonable. Respondent's interest in maintaining the safety of children did not outweigh Petitioner's constitutional interests in freedom of association, expression and movement.
TIME SEQUENCE OF EVENTS
 PERMISSIBLE POLICE ACTION
10:10 p.m. 1 INITIAL OBSERVATION AND DECISION TO
 APPROACH PETITIONER
 IMPERMISSIBLE POLICE ACTION
10:10 p.m. plus 2 OFFICER JENNINGS GRABBED PETITIONER'S
 ARM AS SHE WALKED AWAY
 State's interest in child safety based
 Petitioner's interest in freedom from upon Petitioner's perceived age and
 police intrusion and her freedoms of height, the late hour, her presence in
 association, expression and movement. a high narcotics trafficking area and
 association with a narcotics trafficker.

Figure 3. Impermissible Police Action
When the judicial scales are used to balance the governmental interest against a citizen's privacy interest in freedom from police intrusion and freedoms of association, expression and movement, "the balance ought to be struck on the side of privacy" because "[t]he policy of the Fourth Amendment is to minimize governmental confrontations with the individual."[62] Respondent State of Washington has argued that striking the balance in favor of Petitioner in this case "would insulate criminals who prey upon children by involving them in prostitution, sexual *680 exploitation and narcotics trafficking."[63] However, the Fourth Amendment will not foster this parade of horribles so long as police officers have a reasonable, articulable suspicion of criminal activity before undertaking a stop which leads to detention, search and seizure.[64]

MOTION TO SUPPRESS
"When an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed."[65] In this case, evidence of cocaine was discovered only after (1) seizure of Petitioner, (2) the pat-down frisk of Petitioner, (3) the seizure of cocaine flecks and (4) Petitioner's admission that she had more cocaine in her "bra." Petitioner correctly claims before this Court that her seizure by Respondent was unconstitutional, and thus the subsequently discovered cocaine became the "fruit of the poisonous tree." The trial court should have granted Petitioner's motion to suppress.

CONVICTION UNDER RCW 69.50.401(d)
RCW 69.50.401(d) provides:
It is unlawful for any person to possess a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of his or her professional practice, or except as otherwise authorized by this chapter. Any person who violates this subsection is guilty of a crime, and upon conviction may be imprisoned for not more than five years, fined not more than ten thousand dollars, or both, except as provided for in subsection (e) of this section.
Conviction under RCW 69.50.401(d) requires possession of a "controlled substance," which by statutory definition includes cocaine.[66] Our decision which concludes Petitioner's motion to suppress evidence of cocaine should have been granted thus eliminates the sole basis for her conviction.

SUMMARY AND CONCLUSION
Under the Fourth Amendment to the United States Constitution, a "seizure" by police officers without a warrant is per se unreasonable. One exception to the warrant requirement arises when police are serving in their role as community caretakers. The community caretaking function exception may not be used as a pretext for a criminal investigation. It normally applies to police encounters involving emergency aid and routine checks on health and safety.
Where, as in this case, an encounter involves a routine check on health and safety, its reasonableness depends upon a balancing of a citizen's privacy interest in freedom from police intrusion against the public's interest in having police perform a "community caretaking function." A person's interest in freedom from police intrusion increases when an encounter is elevated to the level of a "seizure." When a person has not been seized, balancing the interests usually favors the action by police. Police officers must be able to approach citizens and permissively inquire whether they will answer questions. This intrusion is minimal and reasonable in light of citizens' expectations that police will assist them in a variety of circumstances.
When a person is seized, however, the intrusion no longer remains minimal. Balancing the interests will not necessarily favor action by police. When in doubt, the balance should be struck on the side of privacy because the policy of the Fourth Amendment is to minimize governmental intrusion into the lives of citizens. The community caretaking function exception should be cautiously applied because of its potential for abuse. Once the exception does apply, police may conduct a noncriminal investigation so long *681 as it is necessary and strictly relevant to performance of the community caretaking function. The noncriminal investigation must end when reasons for initiating an encounter have been fully dispelled.
In this case, the findings of fact reveal two significant events on March 3, 1998:(1) police observation of Petitioner and the decision to approach her at 10:10 p.m. and (2) Officer Jennings' restraint of Petitioner as she began to walk away.
The first event was the starting point for a pre-seizure encounter, albeit a brief one. Balancing the interests leads to a conclusion that that encounter was reasonable. Petitioner's privacy interest in being free from police intrusion was minimal as long as there was no "seizure." Rendering aid or assistance through a health or safety check is a hallmark of the community caretaking function exception. Under the second event, the police officers had no articulable suspicion that Petitioner had committed a criminal offense. She was entitled to walk away and terminate the encounter with the police officers. Petitioner chose to walk away from the two police officers. Officer Jennings grabbed Petitioner by her arm, thus elevating the encounter to a constitutional seizure. After this, Petitioner's privacy interest in being free from police interference was no longer minimal. The officer was no longer permissively inquiring whether Petitioner would answer questions. Petitioner was compelled to answer questions to the satisfaction of the police officers. Otherwise, they would not have allowed her to leave, even when she answered their questions truthfully. In addition, Respondent's detention of Petitioner was based upon facts which suggested imposition of a juvenile curfew law. Seattle has no such law. Curfew laws have not been favored because of criticism they impermissibly infringe upon a citizen's constitutional freedoms of association, expression and movement. Cautious application of the community caretaking function exception leads to our conclusion that the post-seizure action by the officers against Petitioner was unreasonable. Respondent's interest in protecting the safety of children did not outweigh Petitioner's interest in her constitutional freedoms of association, expression and movement.
The community caretaking function exception did not justify seizure of Petitioner by Respondent. Under these circumstances, this was an unconstitutional seizure which tainted all police activity which followed. The trial court should have granted Petitioner's motion to suppress evidence. With suppression of the cocaine, there would be no evidence to support the charged criminal offense under RCW 69.50.401(d).
We reverse the decision of the Court of Appeals, Division I, which affirmed both the conviction of Petitioner Loreal Monique Kinzy and the order of the King County Superior Court denying her motion to suppress.
JOHNSON, ALEXANDER, and SANDERS, JJ., concur.
MADSEN, J. (concurring).
I agree with the majority that the seizure here was an unlawful detention. I also agree with Judge Baker's dissent that applying the community caretaking exception in this case would expand the exception far beyond it limits. State v. L.K., 95 Wash.App. 686, 697, 977 P.2d 39 (1999) (Baker, J., dissenting). Moreover, because this exception defies precise definition, its potential for abuse is high.
The police were justified in their initial contact with L.K. if they were legitimately attempting to determine if she was in need of assistance, but once they determined that she was not, their contact should have ended. The community caretaking function exception serves as a vehicle allowing police to check on persons who appear to be in need of aid. She did not appear to be in distress or in need of medical aid, and, despite her proximity to an area where drug trafficking occurred and to an individual with a history of drug involvement, there was no evidence of any drug activity at the time the police approached. See, e.g., State v. Hutchison, 56 Wash.App. 863, 867, 785 P.2d 1154 (1990) (police properly searched for the identification of a man they found passed out in a parking lot); Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1029 n. 4 (10th Cir. 1997) (police properly stopped a distraught *682 man who was crying, smelled of alcohol, and had his hands over his face as he walked down a street late at night).
Also, although I agree that the community caretaking function is a valid exception, the majority unfortunately states that abuse of the exception will not occur "so long as police officers have a reasonable, articulable suspicion of criminal activity before undertaking a stop which leads to detention search, and arrest." Majority at 680. If the exception for community caretaking applies in a given case, it will allow the police to check on those appearing to be in need of aid without meeting the standards for a Terry stop. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In some cases, carrying out the community caretaking function will lead to detention, search, and arrest, such as in Hutchison, where the search for identification led to the discovery of controlled substances.
I concur in the majority.
TALMADGE, J. (dissenting).
I dissent because the majority turns every encounter between the police and the public into a latent criminal investigation, thereby doing untold damage to law enforcement's traditional community caretaking function. As the majority would have it, police can no longer detain children at risk, runaways, mentally ill and intoxicated persons, and others in distress unless they have a warrant. Requiring a warrant before a person may be detained by police officers exercising their community caretaking responsibilities will have an immediate and devastating effect upon a variety of essential law enforcement functions necessary to preserve the social order and to aid those in harm's way. If no warrant can be obtained absent probable cause criminal activity occurred, police community caretaking will simply disappear except in those fortuitous instances when criminal activity actually coincides with the need for community caretaking.
Modern law enforcement is not confined to criminal investigation. Police officers have numerous civil functions unrelated to criminal investigations, ranging from serving civil warrants to picking up runaway children to detaining mentally ill or intoxicated people for appropriate treatment. In fact, "`Most police work involves noncriminal events. Order maintenance or peacekeeping activities comprise an estimated two-thirds of all calls to the police[.]'" SAMUEL WALKER, THE POLICE IN AMERICA 112 (McGraw Hill 2d ed.1992), quoted in Debra Livingston, Police Community Caretaking, and the Fourth Amendment, 1998 U. CHI. LEGAL F. 261, 263 n. 9. Professor LaFave made this point well when he wrote:
The policeman, as a jack-of-all-emergencies has "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses"; by default or design he is expected to "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," and "to provide other services on an emergency basis." If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of crime discovered thereby is admissible in court.
3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 5.4(c), at 163 (3d ed.1996) (footnote omitted). Another commentator wrote:
Communities have always looked to police to perform social services unrelated or at best partially related to enforcing criminal law. "Community caretaking" denotes a wide range of everyday police activities undertaken to aid those in danger of physical harm, to preserve property, or "to create and maintain a feeling of security in the community." It includes things like the mediation of noise disputes, the response to complaints about stray and injured animals, and the provision of assistance to the ill or injured. Police must frequently "care for those who cannot care for themselves: the destitute, the inebriated, the addicted ... and the very young." They are often charged with taking lost property into their possession; they not infrequently see to the removal of abandoned property. In those place where social disorganization is at its highest, police are even called upon "to serve as surrogate parent or other relative, and *683 to fill in for social workers, housing inspectors, attorneys, physicians, and psychiatrists." Community caretaking, then, is an essential part of the functioning of local police. It in fact occupies such a high proportion of police time that one can even question "the value of viewing the police primarily as a part of the criminal justice system."
Livingston, supra, at 271-72 (footnotes omitted).
The United States Supreme Court in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), first described the broad array of noncriminal, noninvestigative police duties as "community caretaking functions." In Cady, the Court noted: "Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady, 413 U.S. at 441, 93 S.Ct. 2523.
The community caretaker function is a social responsibility demanded by communities of their police officers. People want police to assist at traffic accidents, handle emergencies, aid people in distress, and generally render assistance when needed. The law does not require a warrant for such activities unless the police intend a search or an arrest, and community caretaking functions, by definition, do not fit into either category.[1] A criminal investigative purpose usually arises only by happenstance in these police-community contactsofficers discover criminal conduct or contraband while providing service to the public. Of course, officers acting in their community caretaker role may not do so as a pretext for criminal investigation; should they use their community caretaking responsibilities as a pretext for a criminal investigation, any evidence so developed should be inadmissible. See State v. DeArman, 54 Wash.App. 621, 774 P.2d 1247 (1989); State v. Markgraf, 59 Wash.App. 509, 798 P.2d 1180 (1990).
Washington courts have long discussed the noncriminal, noninvestigative duties of law enforcement. Our cases may be properly divided into four distinct categories:[2] (1) those dealing with medical or other types of emergencies; (2) those dealing with automobile impoundments or inventories; (3) those dealing with a law enforcement officer's role as a preserver of public safety; and (4) those dealing with a statutory mandate requiring an officer's intervention. Washington case law on the community caretaking function of law enforcement officers is broad, as befits a flexible concept rooted in police officers' traditional community service role.
The very first Washington case to use the term "community caretaking" is instructive. In State v. Lund, 10 Wash.App. 709, 519 P.2d 1325 (1974), police stopped Lund's vehicle because it was making excessive noise. They discovered Lund was driving while his license was suspended and arrested him. While Lund was being patted down, he told police there was a loaded gun in his vehicle. The police decided to retrieve the gun for safekeeping because the car was parked along a street traversed by school children and the car could not be safely locked. In retrieving the gun from the car, the police *684 discovered a canister of marijuana, which they seized and was later admitted into evidence. On appeal, Lund challenged the legality of the search of his car.
The Court of Appeals relied on the community caretaking doctrine in holding the search was legal. Because it was within the public safety function of the police to remove the gun from the vehicle, and since they were performing a lawful function when they discovered the marijuana, the marijuana was properly admitted into evidence at Lund's trial. Id. at 712, 519 P.2d 1325.[3] This case fits into either the vehicle impoundment/inventory category or the public safety category of the community caretaking doctrine.
In a subsequent case, the Court of Appeals held an inventory search of a car reasonably impounded comes under the community caretaking doctrine, stating:
Such warrantless inventory searches, when not intended to discover evidence of a crime, have been justified by the "benign purposes" of protection of public safety, protection of the driver's property, protection of the police from danger or from liability for claimed thefts, or protection of temporary storage bailees against false charges.
State v. Hardman, 17 Wash.App. 910, 912, 567 P.2d 238 (1977) (citing South Dakota v. Opperman, 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)), review denied, 89 Wash.2d 1020 (1978).[4]
In State v. Chisholm, 39 Wash.App. 864, 696 P.2d 41 (1985), officers stopped a vehicle to warn defendant his hat was in jeopardy of blowing out of the bed of his pickup truck. When one officer approached the cab of the truck, he noticed an open can of beer between the driver and passenger. Knowing both driver and passenger to be minors, the officer arrested them, and in the search incident to arrest, discovered marijuana. The trial court suppressed the evidence of marijuana, holding the stop of the truck was improper because there was no evidence of criminal activity. The Court of Appeals reversed in a well-reasoned opinion by Judge Reed that is worth quoting at length:
First, we note that a vehicle stop, even for a benign purpose, must be made in harmony with the Fourth Amendment proscription against unreasonable searches and seizures. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Whether a given stop is unreasonable "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). See also Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).
Ordinarily, the balance between public and individual interests is accurately measured by the presence or absence of "probable cause." On occasion, the less demanding "reasonable suspicion" standard is employed. Here, the trial court concluded that the absence of reasonable suspicion to believe criminal activity was afoot rendered the stop unlawful. We disagree. Neither "probable cause" nor "reasonable suspicion" is an appropriate yardstick where the stop was made for noncriminal, noninvestigatory purposes. In that context, whether a particular stop is reasonable depends not on the presence or absence of "probable cause" or "reasonable suspicion," but rather on a balancing of the competing interests involved in light of all the surrounding facts and circumstances. See South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Here, an individual's interest in proceeding about his business unfettered by police interference must be balanced against the public's interest in having police officers perform services in addition to the traditional enforcement of penal and regulatory laws. United States v. Dunbar, 470 F.Supp. 704 (D.Conn.), aff'd, 610 F.2d 807 (2d Cir.1979). This latter interest is sometimes *685 characterized as "community caretaking functions." Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).
One might argue that permitting police officers to make stops without "probable cause" or at least "reasonable suspicion" is so fraught with the potential for abuse that a blanket proscription is necessary. We believe that such an approach is an unnecessarily harsh remedy in light of the safeguards offered by a suppression hearing. We trust that the trial judge will discern a legitimate stop from one based on subterfuge.[[5]] Accordingly, we hold that, in appropriate circumstances, a police officer may stop a vehicle momentarily to warn the occupants that an item of their property is endangered. Such a momentary seizure, being "reasonable," does not require the suppression of contraband or other evidence of crime thereafter discovered merely because the officer lacked probable cause or reasonable suspicion to believe the vehicle's occupants were involved in criminal activity.
Id. at 866-67, 696 P.2d 41 (footnotes omitted). The Chisholm court noted some examples of the community caretaking function in areas not dealing with automobiles: "Many communities look to their officers to assist citizens or render aid under a variety of circumstances. For example, officers often deliver emergency messages, give directions, search for lost children, assist stranded motorists and render first aid." Id. at 867 n. 3, 696 P.2d 41.
In State v. Hutchison, 56 Wash.App. 863, 785 P.2d 1154 (1990), police encountered Hutchison lying unconscious on his back in a parking lot and searched his person for identification and information on his condition. In the course of the search, the officer discovered a controlled substance. Hutchison was charged with two counts of possession of a controlled substance with intent to deliver. At the pretrial suppression hearing, the trial court suppressed the evidence on the ground no medical emergency or exigent circumstances existed to justify the warrantless search. The Court of Appeals reversed, saying:
It has been recognized and accepted in numerous federal and state court decisions that police officers modernly are expected to render aid and assistance on a regular basis to persons who, although perhaps not in need of immediate professional medical treatment, are in danger and in need of help. Searches performed as a part of providing such aid, if reasonable and in good faith, are generally allowed.
. . . .
In this instance, it is undisputed that at the time of the search, Hutchison was in need of aid and assistance. Officer Blair had a reasonable and legitimate concern that Hutchison would be in danger if abandoned in the parking lot. The trial court found that the officer did not search Hutchison for criminal investigatory purposes but in an effort to determine what should be done with him.
Id. at 865, 867, 785 P.2d 1154.[6] This case fits neatly into the public safety category of the community caretaking doctrine.
State v. Menz, 75 Wash.App. 351, 880 P.2d 48 (1994), review denied, 125 Wash.2d 1021, 890 P.2d 463 (1995), is a more recent example of the public safety category. Police responded to an anonymous domestic violence call. When they reached the residence, they found the front door open five or six inches. The lights were on and a television was playing, but no one responded to their knocks and announcements of their presence. Concerned for the safety of the occupants, they entered the house and began searching for persons that might be hiding or incapable of responding. Entering a bedroom, they discovered marijuana plants. They left, obtained a search warrant, and returned to seize the plants.
At the suppression hearing, Menz argued the warrantless search of his home was illegal. The trial court denied the motion to *686 suppress, and the Court of Appeals affirmed, employing the public safety branch of the community caretaking doctrine as justification for the search:
[T]he police in this case were told that domestic violence was occurring. They had reason to believe people were home because the front door was open on a winter night, the lights were on, and the TV was playing. Yet they could not get anyone to answer the front door. As we have already explained, these circumstances generated a reasonable concern for the well-being of the home's occupants[.]
Id. at 355, 880 P.2d 48.
We, too, have long recognized officers may detain individuals without a warrant if one of the categories of community caretaking is involved. See State v. Loewen, 97 Wash.2d 562, 647 P.2d 489 (1982) (search of auto accident victims for identification); State v. Jordan, 79 Wash.2d 480, 487 P.2d 617 (1971) (warrantless entry of motel room to examine defendant at request of motel maid where defendant appeared gray and unmoving on bed). These cases fit into the medical emergency category of the community caretaking doctrine.
We have also expressly recognized the public safety category of the community caretaker doctrine. In State v. Mennegar, 114 Wash.2d 304, 787 P.2d 1347 (1990), officers arrested a person for driving under the influence and impounded his vehicle. They determined a passenger could drive the vehicle and checked the passenger's driver's license, revealing an outstanding arrest warrant. In a search incident to arrest on the warrant, the officers found drugs. We said:
The question then becomes whether it was reasonable and legal for the officer to request the passenger's driver's license and check to insure that the license was valid before turning the intoxicated driver's vehicle over to the passenger. Whether such an encounter, made for noncriminal noninvestigatory purposes, is reasonable depends upon a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a "community caretaking function".
Id. at 313, 787 P.2d 1347. We unanimously upheld the officers' actions as an aspect of the community caretaker function and reversed the trial court's suppression of the evidence. More recently, in Kalmas v. Wagner, 133 Wash.2d 210, 943 P.2d 1369 (1997), we considered a federal civil rights violation claim against two deputy sheriffs who entered a tenant's premises at tenant's request as part of a landlord-tenant dispute. Citing Mennegar, we reiterated the rule: "Whether an encounter made for noncriminal noninvestigatory purposes is reasonable depends on a balancing of the individual's interest in freedom from police interference against the public's interest in having the police perform a `community caretaking function.' " Kalmas, 133 Wash.2d at 216-17, 943 P.2d 1369 (holding there was no unreasonable search because the tenant had invited the deputies into the residence). In Mennegar and Kalmas, we explicitly adopted the balancing rule set forth in Chisholm: "[A]n individual's interest in proceeding about his business unfettered by police interference must be balanced against the public's interest in having police officers perform services in addition to the traditional enforcement of penal and regulatory laws." Chisholm, 39 Wash.App. at 867, 696 P.2d 41 (footnote omitted) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).
The present case involves the fourth category of the community caretaking function: interactions between law enforcement and citizens mandated by statute. Arguably, such statutes express a strong public interest in law enforcement action. We have not confronted this aspect of community caretaking by law enforcement, but in State v. Dempsey, 88 Wash.App. 918, 947 P.2d 265 (1997), the Court of Appeals addressed just such a situation. Dempsey's parents called the police after Dempsey threatened them and they feared for their safety. An officer who responded to the call found Dempsey to be paranoid, verbally abusive, and physically aggressive. The officer had to prevent Dempsey from assaulting his father in the officer's presence. Id. at 921, 947 P.2d 265. The officer decided to take Dempsey to a *687 medical center for a mental health evaluation pursuant to RCW 71.05.150(4)(b).[7] The officer performed a search of Dempsey before putting him into his patrol car and discovered a large folding knife and a bindle containing what was later identified as methamphetamine. He arrested Dempsey, who was convicted after the trial court denied his motion to suppress the methamphetamine evidence.
On appeal, Dempsey argued his detention was pretextual. Dempsey, 88 Wash.App. at 922, 947 P.2d 265. The Court of Appeals held, however, the search was justified:
The relevant statutory language calls for the reasonable perception of "a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm...." former RCW 71.05.020(3)(b) (emphasis added). Once the basis for an involuntary commitment is established, authority for a protective search is implied by statute. Lowrimore, 67 Wash.App. at 956, 841 P.2d 779. Evidence discovered in furtherance of a caretaking function is admissible.
Id. at 923, 947 P.2d 265. Accord State v. Mason, 56 Wash.App. 93, 782 P.2d 572 (1989) (affirming conviction for possession of controlled substance discovered in a pat-down search of man taken into custody for mental health evaluation), review denied, 114 Wash.2d 1010, 790 P.2d 168 (1990).
Like Dempsey, the present case involves a noncriminal, noninvestigative police action the enforcement of a civil statute, the Family Reconciliation Act, chapter 13.32A RCW. The statute sets out a mandatory duty for law enforcement officers to act and the police officers in this case acted pursuant to that statutory mandate. The Act states:
(1) A law enforcement officer shall take a child into custody:
. . . .
(b) If a law enforcement officer reasonably believes, considering the child's age, the location, and the time of day, that a child is in circumstances which constitute a danger to the child's safety or that a child is violating a local curfew ordinance[.]
RCW 13.32A.050(1)(b) (emphasis added).[8]
The police testified they approached Kinzy in the first place because they were concerned about the possibility she might be in danger. Kinzy's diminutive stature made them think she was younger than her 16 years. She was in an area known for drug dealing and in the company of people the police knew to be involved in the drug culture. Pursuant to the statute, the police approached Kinzy to ascertain if she was "in circumstances which constitute a danger to *688 the child's safety."[9] The statute required them to do that, and further required them to take Kinzy into custody if in fact her safety was in danger. It was in attempting to ascertain Kinzy's circumstances, as the statute required them to do, that the police seized her. The police did not stop Kinzy because of inchoate suspicions of criminal activity. They stopped her because they believed in good faith that an 11-to-13-year-old child on a downtown Seattle street at night in the company of known drug dealers might be at risk pursuant to chapter 13.32A RCW.[10]
The majority opinion recognizes RCW 13.32A.050 only in passing, ignoring the duty the statute placed on police to act when they believe a child may be at risk. Instead, the majority treats this case as if it were solely a matter of criminal procedure and determines officers may approach a child such as Kinzy but may not seize her without a warrant. However, the police in this case acted properly under the mandate of the Family Reconciliation Act, legislation designed to assist at-risk children. In the course of their statutory duty under the Act, the officers became reasonably suspicious Kinzy might be in the possession of contraband. She was, in fact, carrying cocaine. Kinzy has not argued the activities of the police leading to the discovery of the cocaine after they seized her were improper. She complains only about the seizure itself.
Although our cases clearly indicate the community caretaking function requires a balancing of the individual's liberty interest with the public's interest in having officers perform noncriminal investigative services, Mennegar, 114 Wash.2d at 313, 787 P.2d 1347; Kalmas, 133 Wash.2d at 216-17, 943 P.2d 1369, the majority's formulation of the question in this case dramatically misapplies the balancing test and instead treats the encounter here as a matter of criminal procedure. The question in this case, properly formulated, boils down to this: if the police, in the furtherance of the mandate of RCW 13.32A.050, approach a juvenile, and the juvenile refuses to answer questions and attempts to leave before the police can determine whether the juvenile is "in circumstances which constitute a danger to the child's safety," is it reasonable for the police to seize the juvenile, i.e., make it so the juvenile is not free to leave, until they can complete their determination?[11] I believe the answer is yes, particularly with regard to children.
"[T]he police are permitted to engage persons in conversation and ask for identification even in the absence of an articulable suspicion of wrongdoing." State v. Young, *689 135 Wash.2d 498, 511, 957 P.2d 681 (1998). Moreover, "a police officer's conduct in engaging a defendant in conversation in a public place and asking for identification does not, alone, raise the encounter to an investigative detention." State v. Armenta, 134 Wash.2d 1, 11, 948 P.2d 1280 (1997). Thus, there was nothing wrong with the police officers' initial approach to Kinzy.
We have held in the case of adults, one is free to disengage from a social contact with police, or simply to walk away from the scene if the police seek to engage. See State v. Mendez, 137 Wash.2d 208, 970 P.2d 722 (1999). Here, however, the police restrained Kinzy from walking away. They did so pursuant to their statutory duty to ascertain whether her safety was in danger.
The police acted in accordance with the statutory mandate here. It is only happenstance that the officers found Kinzy was involved in criminal activity. Pursuant to their statutory duty under the Act, officers are usually obliged to transport a child to the child's home or a crisis residential center and advise the child of the reasons for detention. RCW 13.32A.060(1).[12] If they legally could have done that, they certainly could have detained her briefly on the street to further their determination of whether she was at risk.
That the police acted pursuant to the at-risk children statute apparently makes no difference to the majority.[13] It appears the majority would require a warrant for any detention, even for the reasons set forth in RCW 13.32A.050 or .060 for the child's protection. As noted above, however, the police could not have obtained a warrant because they had no probable cause to suspect criminal activity when they first detained Kinzy.
Under the majority's formulation, officers could approach a 10-year-old runaway dressed like Jodie Foster in the film "Taxi Driver" and inquire if she were in danger. If she were to say no, the officers could do no more. According to the majority opinion, if the officers wanted to detain her, they would *690 need to somehow obtain a warrant. In the majority's view, even young age does not appear to be a sufficient factor, even coupled with compelling circumstances, to justify detaining the juvenile in order to ascertain if he or she is in danger. It is difficult to discern how, in the real world, the runaway youth, the uncooperative tuberculosis patient, or the mentally ill person would conveniently stay in place while the officers got the warrant, assuming a warrant is even available.[14]
The majority opinion leads inevitably to one of the following results: (1) stops or detentions under civil statutes like those involving children at risk, alcoholics, the sick, or the mentally ill are forbidden unless they meet the constitutional standards for criminal matters; or (2) any evidence of a crime discovered in the legitimate furtherance of civil statutes must be suppressed. The first alternative eviscerates statutes designed to aid the most helpless and vulnerable members of society. The second alternative eviscerates the "plain view" or "open view" doctrine. Neither alternative can be correct. The practical effect of the majority's unprecedented analysis is that police officers have no authority to detain a person no matter how compelling or dangerous the circumstances of the person's situation, absent a warrant issued pursuant to criminal procedure.
It is curious this issue should arise today, because these questions were settled at common law hundreds of years ago: "The authority to restrain a dangerously insane person also appears to have existed at common law[.]" Plancich v. Williamson, 57 Wash.2d 367, 369, 357 P.2d 693, 92 A.L.R.2d 559 (1960) (citing 1909 Vermont case). Nor did our judicial ancestors lack our modern, refined sensibilities regarding the countervailing liberty interests of detained mentally impaired persons. In an 1871 case in which the complaint was for "unlawful arrest" by a deputy constable of a person alleged to have been insane, incapable of taking care of himself, and conducting himself in a wild and irrational manner, the Massachusetts Supreme Judicial Court said:
The right which every citizen has to enjoy personal liberty is necessarily subject to some exceptions.... Among them, are the right to restrain a person who ... has fallen in a fit, or is so sick as to be helpless, or is unconsciously going into great danger, or is drunk, or has delirium tremens, or is so insane as to be dangerous to himself or others. In such cases, the right to restrain persons has its foundation in a reasonable necessity, and ceases with the necessity.
Look v. Dean, 108 Mass. 116, 120 (1871). Similarly, our Legislature, out of understandable and laudable concern for children at risk, mandated investigation and action by police in circumstances like those in the present case.
The majority dramatically diminishes law enforcement's community caretaker role generally, *691 and specifically renders unenforceable chapter 13.32A RCW and similar civil statutes authorizing detention of individuals in distress. I decline to analyze every encounter between police and citizens as a proto-criminal investigation to be interpreted under our rules for criminal procedure. I decline to vitiate statutes designed to safeguard the vulnerable. I respectfully dissent.
GUY, C.J., IRELAND, and BRIDGE, JJ., concur.
NOTES
[1] State v. L.K., 95 Wash.App. 686, 977 P.2d 39 (1999).
[2] Id. at 691-95, 977 P.2d 39.
[3] Clerk's Papers at 1.
[4] Report of Proceedings at 3, May 7, 1998.
[5] Clerk's Papers at 7; Report of Proceedings at 70-72, May 7, 1998.
[6] Petitioner's motion to suppress evidence was denied on May 7, 1998. Respondent then prepared a document captioned "Written Findings of Fact and Conclusions of Law to Comply with CrR 3.6," which the trial court signed on July 30, 1998. Respondent filed the document with the King County Superior Court under an erroneous cause number. Because of this error, Respondent filed a motion with this Court to supplement Clerk's Papers with the document. The motion was granted on December 9, 1999.
[7] Report of Proceedings at 15-16, 25, 30, May 7, 1998 (emphasis added).
[8] Hearings, Findings and Decision on Information, Clerk's Papers at 6; Report of Proceedings at 103, May 7, 1998.
[9] Order of Disposition, Clerk's Papers at 9; Report of Proceedings at 28, June 4, 1998; see also RCW 13.40.160(2).
[10] Clerk's Papers at 10.
[11] State v. L.K., 95 Wash.App. at 697, 977 P.2d 39.
[12] Br. of Appellant at 18.
[13] 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[14] State v. L.K., 95 Wash.App. at 694-97, 977 P.2d 39.
[15] Compare Pet. for Review at 1 with Supplemental Br. of Pet'r at 1-17.
[16] Order Granting Discretionary Review.
[17] State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994).
[18] See Supplemental Br. of Pet'r.
[19] See State v. Hill, 123 Wash.2d at 644, 870 P.2d 313.
[20] Findings of Fact and Conclusions of Law to Comply with CrR 3.6, Findings of Fact 1, 2, 8 and 9.
[21] Id. Finding of Fact 2.
[22] Id. Findings of Fact 2 and 3.
[23] Id. Findings of Fact 4, 5, 6 and 7.
[24] Id. Findings of Fact 10 and 11.
[25] Compare Supplemental Br. of Pet'r with Br. of Appellant at 18-23; State v. L.K., 95 Wash.App. at 695-96, 977 P.2d 39.
[26] Compare Supplemental Br. of Pet'r with Br. of Appellant at 23-24; State v. L.K., 95 Wash.App. at 697, 977 P.2d 39.
[27] See Supplemental Br. of Pet'r.
[28] Id. at 3 (citing State v. Kennedy, 107 Wash.2d 1, 4, 726 P.2d 445 (1986) and Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).
[29] Id.
[30] State v. Houser, 95 Wash.2d 143, 149, 622 P.2d 1218 (1980) (citing Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).
[31] Id. (citing Arkansas v. Sanders, 442 U.S. 753, 759, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979)) (internal quotations omitted).
[32] Id.
[33] Petitioner also raised an issue concerning the validity of her seizure under article I, section 7 of the Washington Constitution. Pet. for Review at 1. However, she presented no arguments on this issue other than merely stating: "This Court has consistently held that article I, § 7 of the Washington Constitution is especially protective of an individual's right to privacy." Supplemental Br. of Pet'r at 2-3 n. 2 (citing State v. Parker, 139 Wash.2d 486, 987 P.2d 73 (1999) and State v. Ladson, 138 Wash.2d 343, 356-57, 979 P.2d 833 (1999)). This Court will not address constitutional issues not supported by adequate briefing. State v. Hill, 123 Wash.2d at 648, 870 P.2d 313.
[34] Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000).
[35] Report of Proceedings at 25, May 7, 1998.
[36] 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (emphasis added).
[37] See State v. Houser, 95 Wash.2d at 151, 622 P.2d 1218.
[38] Id. at 151, 622 P.2d 1218. While countenancing the community caretaking function exception announced in Cady, this Court has not explicitly stated the exception applies to article I, section 7 of the Washington Constitution. Cf. State v. Ladson, 138 Wash.2d at 356-57, 979 P.2d 833 (characterizing State v. Houser as "an article I, section 7, case" which "explained that the police may validly exercise the community caretaking function of removing an abandoned vehicle but may not use that authority as a pretext to conduct unrelated criminal investigation."). In Ladson, this Court correctly explained the holding of State v. Houser, but somewhat mischaracterized it as "an article I, section 7, case." In Houser, all citations concerning the community caretaking function exception refer to federal cases interpreting the Fourth Amendment to the United States Constitution and not to article I, section 7 of the Washington Constitution.
[39] See, e.g., State v. Loewen, 97 Wash.2d 562, 567-68, 647 P.2d 489 (1982); State v. Angelos, 86 Wash.App. 253, 255-56, 936 P.2d 52 (1997) (Division I), review denied, 133 Wash.2d 1034, 950 P.2d 478 (1998). The emergency aid doctrine is different from the "exigent circumstances" exception to the warrant requirement. Both involve situations in which police officers must act immediately, but for distinctly different purposes. Unlike the exigent circumstances exception, "the emergency [aid] doctrine does not involve officers investigating a crime but arises from a police officer's community caretaking responsibility to come to the aid of persons believed to be in danger of death or physical harm." State v. Leupp, 96 Wash.App. 324, 330, 980 P.2d 765 (1999) (Division II).
[40] See, e.g., State v. Villarreal, 97 Wash.App. 636, 643-44, 984 P.2d 1064 (1999) (Division III) (community caretaking function exception applied to stop and identification inquiry of defendant found urinating in public).
[41] State v. Hutchison, 56 Wash.App. 863, 865, 785 P.2d 1154 (1990) (Division II).
[42] Mary Elisabeth Naumann, Note, The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception, 26 AM. J. CRIM. L. 325, 333-34 (1999); compare State v. Dempsey, 88 Wash.App. 918, 947 P.2d 265 (1997) (Division III) (search did not exceed scope of emergency involuntary civil commitment) with State v. Villarreal, 97 Wash.App. at 643-44, 984 P.2d 1064.
[43] State v. Menz, 75 Wash.App. 351, 354, 880 P.2d 48 (1994) (Division II), review denied, 125 Wash.2d 1021, 890 P.2d 463 (1995).
[44] 133 Wash.2d 210, 216-17, 943 P.2d 1369 (1997).
[45] Id.
[46] State v. Markgraf, 59 Wash.App. 509, 512, 798 P.2d 1180 (1990) (Division III).
[47] Hudson v. City of Wenatchee, 94 Wash.App. 990, 996, 974 P.2d 342 (1999) (Division III).
[48] State v. Nettles, 70 Wash.App. 706, 712, 855 P.2d 699 (1993) (Division I), review denied, 123 Wash.2d 1010, 869 P.2d 1085 (1994) (emphasis added).
[49] State v. Thorn, 129 Wash.2d 347, 351-52, 917 P.2d 108 (1996) (citing United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).
[50] Id. at 352, 917 P.2d 108 (citing Florida v. Bostick, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).
[51] State v. DeArman, 54 Wash.App. 621, 626, 774 P.2d 1247 (1989) (Division I) (citing United States v. Dunbar, 470 F.Supp. 704, 708 (D.Conn. 1979), aff'd, 610 F.2d 807 (2d Cir.1979)); State v. Hutchison, 56 Wash.App. at 866, 785 P.2d 1154 (Division II).
[52] See State v. Gleason, 70 Wash.App. 13, 17-18, 851 P.2d 731 (1993) (Division III); State v. Markgraf, 59 Wash.App. at 513, 798 P.2d 1180 (Division III) ("The purpose of the stop must be related to an investigation focused on the detainee.").
[53] State v. DeArman, 54 Wash.App. at 626-27, 774 P.2d 1247 (Division I); see State v. Houser, 95 Wash.2d at 155, 622 P.2d 1218 ("As a further protection against abuse, the scope of the search should be limited to those areas necessary to fulfill its purpose.").
[54] RCW 13.32A.010. "`At-risk youth' means a juvenile: (a) Who is absent from home for at least seventy-two consecutive hours without consent of his or her parent; (b) Who is beyond the control of his or her parents such that the child's behavior endangers the health, safety, or welfare of the child or any other person; or (c) Who has a substance abuse problem for which there are no pending criminal charges related to the substance abuse." RCW 13.32A.030(2). A child is an "unemancipated individual who is under the chronological age of eighteen years." RCW 13.32A.030(3).
[55] Chapter 13.32A RCW.
[56] State v. Gocken, 71 Wash.App. 267, 276, 857 P.2d 1074 (1993) (Division I), review denied, 123 Wash.2d 1024, 875 P.2d 635 (1994).
[57] See State v. Thorn, 129 Wash.2d at 352, 917 P.2d 108; see also State v. Mennegar, 114 Wash.2d 304, 313, 787 P.2d 1347 (1990) ("When the officer asked the passenger for his driver's license, the passenger was free to refuse. He also was free to refuse the invitation to drive his intoxicated companion's vehicle.").
[58] Written Findings of Fact and Conclusions of Law to Comply with CrR 3.6 at 1-2.
[59] See State v. L.K., 95 Wash.App. at 691, 977 P.2d 39.
[60] Report of Proceedings at 16, May 7, 1998.
[61] See City of Seattle v. Pullman, 82 Wash.2d 794, 795 n. 1, 514 P.2d 1059 (1973); See State v. J. D., 86 Wash.App. 501, 511, 937 P.2d 630 (1997), review granted, 134 Wash.2d 1006, 954 P.2d 277 (1998). This Court initially granted review but then dismissed it as improvidently granted on May 12, 1998.
[62] United States v. Dunbar, 470 F.Supp. 704, 708 (D.Conn.), aff'd, 610 F.2d 807 (2d Cir.1979).
[63] State v. L.K., 95 Wash.App. at 695, 977 P.2d 39.
[64] See Terry v. Ohio, 392 U.S. at 30, 88 S.Ct. 1868.
[65] State v. Ladson, 138 Wash.2d at 359, 979 P.2d 833.
[66] RCW 69.50.101(d) (defining "controlled substance" as "a drug, substance, or immediate precursor included in Schedules I through V as set forth in federal or state laws, or federal or board rules"); RCW 69.50.206(b)(5) (listing "[m]ethylbenzoylecgonine (cocaineits salts, optical isomers, and salts of optical isomers)" under Schedule II).
[1] The majority makes no mention of how, if ever, the officers in this case could have procured a warrant if they had no probable cause to believe a criminal violation was taking place. As Professor Livingston says:

[T]he probable-cause-and-warrant framework is often plainly inapposite to consideration of the reasonableness of community caretaking intrusions....
In many community caretaking contexts, however, the relevant question is not whether police have an adequate basis to believe they will find particular persons or things in a particular place. Instead, the question is whether they have sufficient reason to act. Thus, when police enter commercial premises inexplicably left open at night in order to secure the property, they are not looking for specific persons or things. They are performing an historically-anchored "watchman's" role. Lacking probable cause to search, however, or the ability to satisfy the particular description requirement of the Warrant Clause, police could not obtain a traditional judicial warrant to support their entry even if they sought one in advance.
Livingston, supra, at 274-75.
[2] See generally, Mary Elizabeth Naumann, The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception, 26 AM. J.CRIM. L. 330 (1999).
[3] This search appears to have been equally justifiable as a search incident to arrest, but the Court of Appeals did not discuss it.
[4] At one time, the Court of Appeals actually limited the community caretaking doctrine to automobiles. See, e.g., State v. Grundy, 25 Wash.App. 411, 417, 607 P.2d 1235 (1980), review denied, 95 Wash.2d 1008 (1981). This is no longer true.
[5] The trial court made precisely that determination in the case at bar.
[6] The Division Two panel in this case consisted of three pro tempore judges: retired Superior Court Judge Schumacher, who wrote the opinion, and Justices Pearson and Utter.
[7] The statute provides:

(4) A peace officer may, without prior notice of the proceedings provided for in subsection (1) of this section, take or cause such person to be taken into custody and immediately delivered to an evaluation and treatment facility or the emergency department of a local hospital:
. . . .
(b) When he or she has reasonable cause to believe that such person is suffering from a mental disorder and presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled.
[8] Many courts have addressed the special status of juveniles and the need for special laws to protect them. In a frequently cited case, the United States Supreme Court said:

The state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities and in matters of employment. A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers, within a broad range of selection. Among evils most appropriate for such action are the crippling effects of child employment, more especially in public places, and the possible harms arising from other activities subject to all the diverse influences of the street. It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parents claim to control of the child or one that religious scruples dictate contrary action.
Prince v. Massachusetts, 321 U.S. 158, 168-69, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (footnote omitted) (upholding state statute forbidding juveniles to sell magazines on streets or public places and penalizing adults who furnish such publications for sale). The Family Reconciliation Act is a reflection of the concerns and policies the Supreme Court expressed in Prince.
[9] The majority appears to be somewhat skeptical about the officers' reasons for approaching Kinzy, but the trial court found the officers' accounts of their activities to be entirely credible and not motivated by pretext. Kinzy does not appeal the trial court's findings on this account, and they are therefore verities.
[10] Justice Madsen states in her concurrence: "[Kinzy] did not appear to be in distress or in need of medical aid." Concurrence at 681. Justice Madsen evidently believes those are the only justifications for the police to have contacted Kinzy, short of probable cause to believe she had committed a crime. Like the majority, Justice Madsen ignores the at-risk children's statute, which requires police to take a child into custody if the officer reasonably believes the child is in circumstances "which constitute a danger to the child's safety." RCW 13.32A.050(1)(b). Justice Madsen also states in her concurrence: "The police were justified in their initial contact with [Kinzy] if they were legitimately attempting to determine if she was in need of assistance, but once they determined that she was not, their contact should have ended." Concurrence at 681 (emphasis added). The police never reached a determination about whether Kinzy was an at-risk child. There is no finding of fact to that effect, and the testimony of the police quoted in the majority opinion is to the contrary. Had the police actually decided Kinzy was not at-risk and then proceeded with a search anyway, such a search would have been prohibited. But that is not what happened.
[11] Although this case addresses only the rights of juveniles under the Family Reconciliation Act, the majority's treatment raises significant implications for all community caretaking functions, including the fourth category relating to civil statutes involving involuntary stops and detentions. See RCW 71.05.150 (detention of mentally disordered persons for evaluation and treatment); RCW 70.96A.140 (involuntary commitment of alcoholics and minors incapacitated by alcoholism or drug addiction); RCW 71.34.040 (temporary involuntary detention of minor for evaluation of need for mental health services); RCW 70.28.031 (providing for involuntary detention, testing, treatment and quarantine of tuberculosis patients).
[12] The officers' statutory obligations are explicit and extensive:

(2) Law enforcement custody shall not extend beyond the amount of time reasonably necessary to transport the child to a destination authorized by law and to place the child at that destination. Law enforcement custody continues until the law enforcement officer transfers the custody to a person, agency, or other authorized entity under this chapter, or releases the child because no placement is available. Transfer of custody is not complete unless the person, agency, or entity to whom the child is released agrees to accept custody.
(3) If a law enforcement officer takes a child into custody pursuant to either subsection (1)(a) or (b) of this section and transports the child to a crisis residential center, the officer shall, within twenty-four hours of delivering the child to the center, provide to the center a written report detailing the reasons the officer took the child into custody. The center shall provide the department with a copy of the officer's report.
(4) If the law enforcement officer who initially takes the juvenile into custody or the staff of the crisis residential center have reasonable cause to believe that the child is absent from home because he or she is abused or neglected, a report shall be made immediately to the department.
(5) Nothing in this section affects the authority of any political subdivision to make regulations concerning the conduct of minors in public places by ordinance or other local law.
(6) If a law enforcement officer receives a report that causes the officer to have reasonable suspicion that a child is being harbored under RCW 13.32A.080 or for other reasons has a reasonable suspicion that a child is being harbored under RCW 13.32A.080, the officer shall remove the child from the custody of the person harboring the child and shall transport the child to one of the locations specified in RCW 13.32A.060.
RCW 13.32A.050(2) through (6).
[13] Serious questions about dereliction of duty would have arisen had the officers let Kinzy walk away simply because that is what she wanted to do. As Judge Agid put it:

When an officer believes in good faith that someone's health or safety may be endangered, particularly if that person is known to have physical or mental problems, public policy does not demand that the officer delay any attempt to determine if assistance is needed and offer that assistance while a warrant is obtained. To the contrary, the officer could be considered derelict by not acting promptly to ascertain if someone needed help.
State v. Gocken, 71 Wash.App. 267, 276, 857 P.2d 1074 (1993) (upholding warrantless search when police were summoned by a relative fearful of elderly aunt's health), review denied, 123 Wash.2d 1024, 875 P.2d 635 (1994). The same reasoning applies to situations in which children may be at risk.
[14] This is not an idle concern. Consider the circumstance in a case we decided last year:

McClenahan had returned to his mother's Lynnwood house after extensive travel, appearing disheveled, having lost all of his clothing during his journeys. At his mother's home, McClenahan engaged in imaginary conversations and advised his mother that people were out to get him, monitoring him via satellites and radio waves. McClenahan's mother finally locked him out of her house until he agreed to take his medications. In response, McClenahan stood outside in the rain for hours and finally climbed onto the roof of his mother's house, where he began running around, striking the skylight, and screaming. McClenahan's mother phoned the local police.
In re Detention of A.S., 138 Wash.2d 898, 905-06, 982 P.2d 1156 (1999). Here, the police responded to the call of McClenahan's distraught mother on a matter that had no criminal overtones. The police took McClenahan into custody pursuant to chapter 71.05 RCW, the involuntary civil commitment act. If a search of McClenahan incident to his being taken into custody had revealed contraband, he might have been charged criminally. Under the majority's rule in this case, that evidence would have to be suppressed because the police had no warrant to seize him in the first place.
What would the majority have the police do in such cases? They could not have obtained a warrant because when they observed McClenahan running around on the roof of his mother's house striking the skylight and screaming, they had no probable cause to believe any criminal activity was afoot. If they had called up to McClenahan and asked him to come down, and he said in response, "Go away and leave me alone; I am just fine," should the police have simply departed after telling Mrs. McClenahan to have a nice day? That is the result the majority opinion demands.