# FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 15, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 15, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 103530-6 |
| Respondent, | |
| | En Banc |
| v. | |
| AHMED MOHAMUD WASUGE, | |
| | Filed: January 15, 2026 |
| Petitioner. | |

WHITENER, J. – This case involves an "affected by" felony driving under the influence offense and an "affected by" physical control of a motor vehicle offense. In Washington, under RCW 46.61.502(1)(c), a person can be found guilty of driving under the influence of intoxicating liquor if the person drives a vehicle while "affected by" intoxicating liquor. Under RCW 46.61.504(1)(c), a person can be found guilty of being in actual physical control of a motor vehicle while under the influence of intoxicating liquor if the person has actual physical control of a vehicle while "affected by" intoxicating liquor. Ahmed Mohamud Wasuge was charged with both crimes under the "affected by" prong of each statute.

At trial, the jury was tasked with determining whether Wasuge was driving or in actual physical control of a motor vehicle, and whether he was under the influence of or affected by intoxicating liquor, such that his ability to drive a motor vehicle was lessened in any appreciable degree. RCW 46.61.502(1)(c), .504(1)(c). Clerk's Papers (CP) at 157 (jury instruction 10).

The jury did not reach a unanimous verdict on the "affected by" felony driving under the influence charge[1] but instead convicted Wasuge of the lesser included offense of being in actual physical control of a motor vehicle while under the influence of or affected by intoxicating liquor. RCW 46.61.504(1)(c). He also was convicted of operating a motor vehicle without a functioning ignition interlock device and driving while his license was revoked. CP at 173-74.

Wasuge raises two issues in this appeal: (1) whether the State's toxicologist expert's testimony about impairment and blood alcohol concentration (BAC) levels constituted improper opinion on guilt and, if so, whether it was harmless error and (2) whether his statements should have been suppressed pursuant to *Miranda*.[2]

---

[1] Wasuge stipulated that he had been previously convicted of a felony offense under RCW 46.61.502(6).
[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

2

FACTUAL BACKGROUND

I.      Wasuge's Arrest on October 12

On October 12, 2022, Wasuge, a Black man, was driving home after hanging out with a friend the night before. 3 Verbatim Rep. of Proc. (VRP) at 1292, 1300. As Wasuge was driving home, his car broke down on a residential road. 3 VRP at 1292-93. The road had both a northbound and a southbound lane. CP at 176. Wasuge tried to physically push his car to the side of the road. 3 VRP at 1294. He called his family and friends to see if anyone could come and help him as he could not afford to pay for a tow truck service. *Id*. As Wasuge was waiting for someone to return his phone calls, he reclined in the driver's seat and fell asleep. 3 VRP at 1294-97, 1320.

At 6:31 a.m., a 911 call came in, reporting a car blocking a roadway at a location near where Wasuge's car was found. CP at 176. Two King County Sheriff's Office deputies, Deputy Andrew Robinson and Deputy Andrew Farley, responded to the dispatch. CP at 176-77. Deputy Robinson arrived at the scene at 6:41 a.m., and Deputy Farley arrived shortly after at 6:43 a.m. CP at 177. They found Wasuge's car blocking the southbound lane of traffic. *Id*. The deputies observed the car with its headlights and taillights on. 3 VRP at 1085, 1186-87. Deputy Robinson observed Wasuge, asleep in the front seat, with his mouth open and eyes closed. 3 VRP at

1186. The car's transmission was in drive, the car's engine was idling, and Wasuge's feet were on the floorboard near the pedals. 3 VRP at 1086-87, 1186-90. In order to ensure that Wasuge's car did not start moving, Deputy Robinson and Deputy Farley decided to use their cars to box in the car before contacting Wasuge. 1 VRP at 397-98; 3 VRP at 1188-89. Deputy Farley's car was about a foot or two from the back of Wasuge's car, and Deputy Robinson's car was about a foot or two from the front of Wasuge's car. 1 VRP at 397; 3 VRP at 1188. Deputy Robinson's car's overhead lights were turned on and facing Wasuge's car. 1 VRP at 355-57; 3 VRP at 1188.

Once Wasuge's car was boxed in, Deputy Farley knocked on Wasuge's window, announcing himself as "'Sheriff's Office'" or "'Sammamish Police.'" 1 VRP at 357-58. Wasuge "kind of roused"; had difficulty rolling down the driver's window; appeared dazed and confused and his eyes were glassy, watery, and bloodshot. 1 VRP at 359-60, 476. Deputy Farley recalled that once Wasuge rolled his window down, he could smell alcohol coming from the car. 1 VRP at 476. Deputy Farley suspected that Wasuge was under the influence of alcohol and requested that he exit the car. Upon Wasuge's exiting of the car, Deputy Farley smelled the odor of alcohol coming from Wasuge and also observed Wasuge swaying and walking unsteadily. 1 VRP 360-61, 477; 3 VRP at 1094-97.

Deputy Farley advised Wasuge that he was detained for a driving under the influence (DUI) investigation. 1 VRP at 476-77. Deputy Farley asked Wasuge how much alcohol he had consumed, and Wasuge denied consuming alcohol. 1 VRP at 478. Wasuge explained the reason he was sleeping in the middle of the road as "something to the effect of he had pulled up and had fell [sic] asleep waiting for a friend." 1 VRP at 478-79. Deputy Farley asked Wasuge for his driver's license. 1 VRP at 375. Wasuge initially provided a name, but Deputy Farley was unable to get any information after entering the name in the computer. 1 VRP at 455. Wasuge then wrote the name down, and it still could not be found. 1 VRP at 455-56. Wasuge then permitted Deputy Robinson to enter his car to retrieve his phone because he had a picture of his ID on his phone. 1 VRP at 403-04. Wasuge then provided Deputy Farley with a photo of his ID on his phone, which also did not return successful results when Deputy Farley ran it in his system. 1 VRP at 455-56. After several minutes of waiting for Wasuge to find his ID on his phone, Deputy Farley asked Wasuge to sit on the front bumper of the patrol car while he explained his request for Wasuge to perform field sobriety tests (FSTs). 1 VRP at 383, 459-60. Wasuge agreed and the FSTs were conducted on the public sidewalk. 1 VRP at 464-67; 3 VRP at 1106-23, 1190-91. Wasuge performed poorly on the FSTs. 1 VRP at 464-67; 3 VRP at 1106-23. Deputy Farley determined that Wasuge was intoxicated,

placed him under arrest, and read him his *Miranda* warnings. 1 VRP at 467-70; 3 VRP at 1123-24. Deputy Farley subsequently obtained a warrant to obtain a sample of Wasuge's blood. 3 VRP at 1135-36. Wasuge's test result showed a BAC level of 0.076 percent. 3 VRP at 1263.

II.    Trial Proceedings

The State charged Wasuge with three counts: count 1—driving under the influence, count 2—operating a vehicle without a functioning ignition interlock device, and count 3—driving while his license was revoked. Wasuge stipulated at trial that he was required to drive with a functioning ignition interlock device, that his license was revoked, and that he had a prior felony DUI conviction. CP at 141, 135, 139. The plea elevated count 1 to a felony DUI. CP at 1-2. Prior to trial, Wasuge unsuccessfully sought to suppress non-*Mirandized* statements he made to Deputy Farley. 2 VRP at 564-78.

At trial, Wasuge testified and admitted that he had been drinking with his friend the night before. 3 VRP at 1295, 1301. Deputy Farley and Deputy Robinson testified at trial that the stop developed into a possible DUI investigation after observing DUI indicators. 3 VRP at 1078-1144, 1180-1201.

During voir dire, the State, without objection from the defense, repeatedly asked jurors about the merits of proposed state legislation to lower the legal drinking limit in Washington State to a BAC limit of 0.05 percent. 2 VRP at 799-804, 808-11, 852-53, 934-38, 978-79.

During the trial, and over Wasuge's objection, the State's forensic toxicology expert witness, Stacy Dougher, testified about the policies and procedures followed at the lab for testing blood samples in general and specifically that she tested Wasuge's blood sample and the test result showed a BAC of 0.076 percent. 3 VRP at 1251-78. In addition, and most relevant to the issue before us, Dougher specifically testified that the American Medical Association (AMA) "understand[s] that people are potentially affected by alcohol at a level less than that .08 [percent], and so they recognize that likely predominantly or all individuals are impaired at a .05 [percent] instead, and they do recommend that as a better cutoff." 3 VRP at 1271. During closing arguments, the State asked the jury to consider Dougher's testimony about the AMA's recommendation of a BAC limit of 0.05 percent. 3 VRP at 1394.

PROCEDURAL HISTORY

The Court of Appeals held that admitting the toxicologist's testimony was a nonconstitutional error because it was speculative and irrelevant. *State v. Wasuge*,

32 Wn. App. 2d 226, 238-39, 555 P.3d 910 (2024) (published in part). The court applied the nonconstitutional harmless error standard of review and concluded that Wasuge was not entitled to a new trial. *Id*. at 239. Wasuge filed a motion for reconsideration, arguing for the first time that the court should have applied the constitutional harmless error standard of review because Dougher's testimony constituted an improper opinion on guilt, a constitutional error. The Court of Appeals then issued a substitute decision, which was the same as its original decision except for a footnote explaining that even under the constitutional harmless error standard of review, the error was harmless in light of the overwhelming evidence of guilt. *Id*. at 239 n.4. The court reasoned that the State had established beyond a reasonable doubt that any reasonable juror would have reached the same result absent Dougher's testimony given the overwhelming evidence of Wasuge's guilt. *Id*. The court pointed to the following evidence as overwhelming evidence of guilt: (1) testimony that Wasuge was found asleep behind the wheel of his vehicle, sitting in a lane of travel with the engine idling and the gearshift in drive, (2) Deputy Farley's testimony about the odor of alcohol emanating from Wasuge's person, (3) Deputy Farley's and Deputy Robinson's observations of Wasuge's unsteady body movements, slurred speech, and bloodshot and watery eyes, (4) Wasuge's poor

performance on the FSTs, (5) Wasuge's own admission that he had consumed alcohol the night before, and (6) Wasuge's 0.076 percent BAC level. *Id*. at 238-39.

In addition, the Court of Appeals held that Wasuge was not in custody for *Miranda* purposes when he responded to Deputy Farley's questions about whether he had consumed alcohol and why he was sleeping in his car in the middle of the road. *Wasuge*, No. 85286-8-I, slip op. (unpublished portion) at 21, https://www.courts.wa.gov/opinions/pdf/852868%20orderandopinion.pdf. The Court held that "a reasonable person in Wasuge's position would not believe they were in police custody to a degree associated with formal arrest when Wasuge made the statements at issue." *Id*. We granted review.

## ISSUES

1. Did the trial court abuse its discretion when it admitted the state toxicologist expert's testimony? If so, was the error harmless?

2. Under the "totality of the circumstances" test for determining whether a person is in "custody" for *Miranda* purposes, are courts precluded from considering as factors race and ethnicity?

ANALYSIS

I.      Harmless Error

Decisions to admit evidence are reviewed using an abuse of discretion standard. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). The trial court has abused its discretion on an evidentiary ruling if it is contrary to law. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001). "An abuse of discretion exists '[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based on untenable grounds or reasons.'" *Id*. (alteration in original) (quoting *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)). The trial court is given considerable discretion to determine if evidence is admissible. *Demery*, 144 Wn.2d at 758. "Where reasonable persons could take differing views regarding the propriety of the trial court's actions, the trial court has not abused its discretion." *Id*.

The Court of Appeals reviewed the state toxicologist's expert testimony and determined that it was improperly admitted. The court held that it was nonconstitutional error to admit the toxicologist's testimony. Under either the constitutional or nonconstitutional error test, the error here was harmless.

In Washington, it is not unlawful for a person to consume intoxicating liquor and drive a motor vehicle. RCW 46.61.502; CP at 157 (jury instruction 10). A person

can be charged in one of four ways for the offenses of "driving under the influence" or the lesser offense of "physical control of vehicle while under the influence." RCW 46.61.502;[3] .504.[4] Each offense includes a "per se" prong and an "affected by" prong. The "per se" prongs require the State to prove that the defendant had a BAC level of 0.08 percent or higher, whereas the "affected by" prongs do not require this showing.

Here, the State elected to try Wasuge solely under the "affected by" prongs for the offenses of felony DUI and physical control. The State was required to prove "the person's ability to drive a motor vehicle is lessened in *any* appreciable degree." CP at 157 (jury instruction 10) (emphasis added); *see also State v. Arndt*, 179 Wn. App. 373, 386, 320 P.3d 104 (2014). The testimony at issue comes from the State's

---

[3] RCW 46.61.502 states, "(1) A person is guilty of driving while under the influence of intoxicating liquor, cannabis, or any drug if the person drives a vehicle within this state: (a) And the person has, within two hours after driving, an alcohol concentration of 0.08 or higher as shown by analysis of the person's breath or blood made under RCW 46.61.506; or (b) The person has, within two hours after driving, a THC concentration of 5.00 or higher as shown by analysis of the person's blood made under RCW 46.61.506; or (c) While the person is under the influence of or affected by intoxicating liquor, cannabis, or any drug; or (d) While the person is under the combined influence of or affected by intoxicating liquor, cannabis, and any drug."

[4] RCW 46.61.504 states, "(1) A person is guilty of being in actual physical control of a motor vehicle while under the influence of intoxicating liquor or any drug if the person has actual physical control of a vehicle within this state: (a) And the person has, within two hours after being in actual physical control of the vehicle, an alcohol concentration of 0.08 or higher as shown by analysis of the person's breath or blood made under RCW 46.61.506; or (b) The person has, within two hours after being in actual physical control of a vehicle, a THC concentration of 5.00 or higher as shown by analysis of the person's blood made under RCW 46.61.506; or (c) While the person is under the influence of or affected by intoxicating liquor or any drug; or (d) While the person is under the combined influence of or affected by intoxicating liquor and any drug."

forensic toxicology expert witness, Stacy Dougher. Dougher testified about the policies and procedures followed at the lab for testing blood samples in general and specifically that she tested Wasuge's blood sample and the test result showed a BAC of 0.076 percent. 3 VRP at 1251-78. More specifically, Dougher, over defense objection, testified that the AMA "understand[s] that people are potentially affected by alcohol at a level less than that .08 [percent], and so they recognize that likely predominantly or all individuals are *impaired* at a .05 [percent] instead, and they do recommend that as a better cutoff." 3 VRP at 1271 (emphasis added). The State, during closing arguments, asked the jury to consider Dougher's testimony about the AMA's recommendation of a BAC limit of 0.05 percent. 3 VRP at 1394. The Court of Appeals ruled that the trial court's admission of this testimony violated our Rules of Evidence. Wasuge asserts that admission of that testimony also violated his constitutional rights. We must now decide whether admission of that evidence requires reversal, whether it was an evidentiary error or a constitutional error.

Here, the error was harmless under both constitutional and nonconstitutional standards. Wasuge requests that we clarify the test for determining whether a constitutional error is harmless. We did so in a recent opinion, *State v. Magana-Arevalo*, where we answered a similar question. *State v. Magana-Arevalo*, No. 103586-1 (Wash. Jan. 15, 2026). In *Magana-Arevalo*, we held that the correct test

for determining whether a constitutional error is harmless is to consider "(1) the corrosive impact of the constitutional error … including its impact on how the fact finder might consider even the properly admitted evidence, as well as (2) the strength of the properly admitted evidence of guilt. Considering the impact of both types of evidence, we then ask whether the State has carried its burden of proving that the constitutional error was harmless beyond a reasonable doubt." *Id*., slip op. at 3.

In this case, we need not decide whether Dougher's testimony expressed an improper opinion, nor do we need to decide whether the constitutional error or nonconstitutional error standard applies. Assuming without deciding that the testimony was improper, under either analysis, the error is ultimately harmless.

It was an undisputed fact that Wasuge's BAC level was 0.076 percent. The AMA is a major medical association, and Dougher is a trained toxicology expert. Dougher testified that the AMA's recommended BAC level indicated only that people are "*potentially* affected" by alcohol at a level less than 0.08 percent and that "predominantly or all individuals" are impaired at a 0.05 percent instead. 3 VRP at 1271 (emphasis added). She also testified that the AMA recommends 0.05 percent "as a better" cutoff indicator for impairment. *Id*. This opinion testimony meant that Wasuge would have been considered "impaired," based on the AMA's recommended cutoff, but there was no testimony from Dougher as to Wasuge

13

specifically. Taken together, it is likely this testimony would have an impact on the jury's determination about Wasuge's impairment level, a critical element the State had to prove beyond a reasonable doubt.

However, considering the strength of the properly admitted evidence, there is overwhelming evidence to find Wasuge guilty. There was testimony about the odor of alcohol emanating from Wasuge and separately emanating from his vehicle, as well as observations of his unsteady body movements, slurred speech, and bloodshot and watery eyes. 1 VRP at 359-61, 376-77, 476-77. Wasuge performed poorly on the FSTs. 3 VRP at 1122-23. Wasuge testified that he had consumed alcohol, and this was confirmed with his 0.076 percent BAC level result. 3 VRP at 1295, 1263.

In sum, the properly admitted evidence considered alongside the corrosive impact of Dougher's testimony weighs in favor of the jury's finding that Wasuge was in physical control of a motor vehicle while impaired to an appreciable degree by intoxicating liquor.

The Court of Appeals found Dougher's testimony to be speculative and irrelevant evidence and determined that it amounted only to a nonconstitutional evidentiary error. Accordingly, the court applied the less stringent nonconstitutional harmless error standard. Under the nonconstitutional harmless error standard,

Wasuge is not entitled to a new trial unless he shows that "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Goggin*, 185 Wn. App. 59, 69, 339 P.3d 983 (2014) (internal quotation marks omitted) (quoting *State v. Calegar*, 133 Wn.2d 718, 727, 947 P.2d 235 (1997)). "The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

Assuming the error here was merely a nonconstitutional evidentiary error, it was also harmless. For the same reasons stated above, there was overwhelming evidence that Wasuge was affected by alcohol, and we cannot conclude within reasonable probabilities that had the error of admitting Dougher's testimony not occurred the outcome of the trial would have been materially affected. The impairment evidence against Wasuge went far beyond Dougher's improper opinion testimony. The State presented eyewitness testimony about the smell of alcohol on his person and his mannerisms at the scene, which were suggestive of alcohol impairment; his admission at trial that he consumed alcohol, after previously denying any alcohol consumption; his unsatisfactory performance on field sobriety tests; and his BAC test result of 0.076 percent. 1 VRP at 359-61, 376-77, 476-77; 3

VRP at 1123. Thus, under the nonconstitutional evidentiary error finding, the error was harmless in light of the strength of the properly admitted evidence of Wasuge's guilt and the limited impact of Dougher's testimony.

II.     Race, Ethnicity, and *Miranda*

Race and ethnicity are relevant factors courts may consider in determining whether a person is in custody for *Miranda* purposes. 384 U.S. 436. If a law enforcement officer fails to provide *Miranda* warnings to a suspect before conducting a custodial interrogation, statements made by the suspect during the interrogation cannot be used as evidence in a criminal prosecution. *State v. Escalante*, 195 Wn.2d 526, 529, 461 P.3d 1183 (2020). However, here, the court's consideration of the factors of race and ethnicity is not dispositive because Wasuge was not in "custody" for *Miranda* purposes when he answered Deputy Farley's questions.

Wasuge was not in custody for *Miranda* purposes when he answered Deputy Farley's questions. Whether someone is in custody for *Miranda* purposes is a question of law we review de novo. *Id*. at 531. Not all contact with law enforcement is for investigation of a crime. "[L]aw enforcement officers are 'jacks of all trades' and frequently engage in community caretaking functions that are unrelated to the

16

detection and investigation of crime, 'including … assisting stranded motorists, and rendering first aid.'" *State v. Boisselle*, 194 Wn.2d 1, 10, 448 P.3d 19 (2019) (internal quotation marks omitted) (quoting *State v. Kinzy*, 141 Wn.2d 373, 387, 5 P.3d 668 (2000)).  Under the community caretaking function, the contact and "'inquiry must be "reasonably related in scope to the justification for their initiation."'" *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975) (quoting *Terry v. Ohio*, 392 U.S. 1, 29, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968))).  "In determining whether an officer's encounter with a person is reasonable as part of a routine check on safety, we must balance the 'individual's interest in freedom from police interference against the public's interest in having the police perform a community caretaking function.'" *State v. Acrey*, 148 Wn.2d 738, 750, 64 P.3d 594 (2003) (internal quotation marks omitted) (quoting *Kinzy*, 141 Wn.2d at 387). "Even a routine stop for a safety check, if it involves a 'seizure' by detaining, must be necessary and strictly relevant to performance of the noncriminal investigation." *Id*.  However, "'[t]he noncriminal investigation must end when reasons for initiating an encounter are fully dispelled.'" *Id*. (quoting *Kinzy*, 141 Wn.2d at 388).

Washington has adopted the "*Berkemer* test" for determining custody for *Miranda* purposes. *State v. Heritage*, 152 Wn.2d 210, 218, 95 P.3d 345 (2004) (citing *McCarty*, 468 U.S. at 439-40). A person detained during a traffic stop is not in custody for *Miranda* purposes. *McCarty*, 468 U.S. at 442 (a traffic stop where a driver was stopped by a single officer and asked to perform an FST is not a formal arrest that triggers *Miranda*). This court has recognized the same. *See State v. Mecham*, 186 Wn.2d 128, 380 P.3d 414 (2016) (plurality opinion) (holding that a field sobriety test is a lawful seizure when supported by reasonable suspicion); *see also Heinemann v. Whitman County*, 105 Wn.2d 796, 718 P.2d 789 (1986) (holding same). This court reasoned that traffic stops are generally not considered custodial for *Miranda* purposes because traffic stops are ordinarily temporary and brief, the atmosphere of these stops are also considered to be less police-dominated given that a driver is usually encountering only one or a few officers, and the encounter usually occurs in more public settings where there are pedestrians or other drivers in sight. *Escalante*, 195 Wn.2d at 534-35.

The initial contact Deputies Farley and Robinson had with Wasuge was part of their community caretaking function. The deputies were dispatched to the scene in response to a 911 phone call of a vehicle stopped in a lane of traffic on a two-lane road. 3 VRP at 1082-83. Upon arrival, Deputy Farley observed the vehicle blocking

the southbound lane of traffic. He saw Wasuge asleep in the driver's seat, his body leaned back, his mouth agape, and his feet resting in the driver's footwell. 3 VRP at 1086-87. He noticed it was an automatic vehicle with the car engine running and the transmission in drive. 3 VRP at 1087. He also observed that the car was not on a flat roadway. 3 VRP at 1088. Deputy Farley "thought it likely the person, if they were asleep like that, they could have woke up startled and moved their feet and they could have hit the gas and could have run one of us over." 3 VRP at 1089. In light of the risk of danger posed by Wasuge's vehicle, Deputies Farley and Robinson decided to box in Wasuge's car. *Id*.

After approaching the vehicle, Deputy Farley knocked on the driver's side window of the car and stated, "'Sheriff's Office'" or "'Law Enforcement, Police.'" 3 VRP at 1092-93. Wasuge awoke, and Deputy Farley described Wasuge's demeanor as "dazed and confused" and his eyes were "bloodshot, glassy, and watery." 3 VRP at 1094. Deputy Farley smelled an odor of alcohol emanating from the vehicle, and he asked Wasuge to exit the vehicle. 3 VRP at 1095. Wasuge complied, and Deputy Farley observed that he was stumbling after exiting the vehicle. Deputy Farley then smelled alcohol on Wasuge's person and asked him why he was asleep in the middle of the roadway. 3 VRP at 1096-97. Wasuge said he was waiting for a friend. *Id*. Deputy Farley then asked Wasuge if he had been drinking

19

any alcohol, and Wasuge said he had not. *Id*. Deputy Farley asked Wasuge again if he had been drinking, and commented that he could smell alcohol, and Wasuge again denied drinking alcohol. 3 VRP at 1097. Wasuge performed poorly on the voluntarily FSTs. 3 VRP at 1122-23.

Wasuge argues he was in custody for *Miranda* purposes when Deputy Farley asked him whether he had been drinking and why he was asleep in his car. He asserts that the totality of the circumstances created a coercive environment in which a reasonable person would not have felt able to refuse to answer Deputy Farley's questions regarding whether he consumed alcohol that night. Wasuge testified that he did not trust the officers' demeanor and approach toward him and that he did not feel like they were there to help him. 3 VRP at 1295. According to Wasuge, the car was in park, and the engine was not running, but it was making a "cranking noise" due to the mechanical failures. 3 VRP at 1314.

Deputy Farley and Deputy Robinson were conducting their community caretaking duties when they responded to a vehicle blocking the roadway call. It was during this community caretaking encounter that Deputy Farley questioned Wasuge about consuming alcohol. According to Deputy Farley, he developed a reasonable suspicion of a DUI when, during their encounter, he observed Wasuge in his car with glassy and watery eyes and smelled alcohol emanating from his car. 1 VRP at 476.

He then told Wasuge he was being detained because of a possible DUI and proceeded to ask him about whether he had been drinking alcohol and why he was asleep in his car. 1 VRP at 477-78. The entire contact up until the arrest lasted about 20 minutes long and it occurred in a public setting on a road in a residential neighborhood with cars passing by. 2 VRP at 558; 3 VRP at 1191. The record indicates that there was also no evidence of coercion. Deputy Farley did not raise his voice or make any threats, and Wasuge never asked to leave the scene. 1 VRP at 453. Wasuge was not placed in handcuffs or in the patrol vehicle. 1 VRP at 454. Even though multiple officers arrived at the scene after Deputies Farley and Robinson arrived, these officers were solely there to redirect traffic and otherwise had no interaction with Wasuge. 1 VRP at 439-40; 2 VRP at 551-52.

Wasuge was not in custody for *Miranda* purposes when he answered Deputy Farley's questions about whether he had been drinking and why he was asleep in his car in the middle of the road.

*Courts may consider the factors of race and ethnicity in applying the "totality of the circumstances" custody test for* Miranda

Whether a defendant was in "custody" for purposes of receiving *Miranda* warnings depends on how a reasonable person in the suspect's position would have

understood the circumstances. *Escalante*, 195 Wn.2d at 533-34; *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (stating that whether a suspect is in custody is an objective inquiry that avoids burdening the police with idiosyncrasies of every individual suspect and each person's subjective state of mind). It is an objective test that requires consideration of different factors under the "totality of the circumstances test." *Escalante*, 195 Wn.2d 526. Factors include the length of the interrogation, the nature of the location where the interrogation occurred, the extent to which the location where the interrogation occurred was in the public eye, whether the defendant was separated from his belongings, whether the defendant was able to freely move and leave the area and terminate the encounter, and the coercive nature of the encounter. *See generally, e.g., Escalante*, 195 Wn.2d at 538-39; *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); *McCarty*, 468 U.S. 420; *State v. Warner*, 125 Wn.2d 876, 889 P.2d 479 (1995); *Howes v. Fields*, 565 U.S. 499, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012); *State v. Templeton*, 148 Wn.2d 193, 59 P.3d 632 (2002); *United States v. FNU LNU*, 653 F.3d 144 (2d Cir. 2011).

Our custody inquiry has never excluded relevant and objective factors in the "totality of the circumstances" test. In *J.D.B.*, the court stated, "Not once have we excluded from the custody analysis a circumstance that we determined was relevant

22

and objective, simply to make the fault line between custodial and noncustodial 'brighter.' Indeed, were the guiding concern clarity and nothing else, the custody test would presumably ask only whether the suspect had been placed under formal arrest." 564 U.S. at 280. The test by design is a holistic one that considers numerous different factors and contexts. The inquiry "remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant." *Escalante*, 195 Wn.2d at 538-39 (quoting *FNU LNU*, 653 F.3d at 154 (citing *McCarty*, 468 U.S. at 441 n.34)). A holistic inquiry includes race and ethnicity as relevant factors that may be objectively considered when relevant.

Washington law recognizes race and ethnicity as any other relevant and objective evidence that can be considered under the totality of the circumstances test when analyzing custody for *Miranda* purposes. However, in this case, Wasuge was not in custody for *Miranda* purposes. Also, Wasuge did not present relevant and objective evidence of race and ethnicity as factors for the trial court to consider at his *Miranda* suppression hearing. 2 VRP at 544-79. Washington law does not preclude courts from considering race and ethnicity in the "totality of the circumstances" test. We require only that such evidence be relevant and objective.

CONCLUSION

There was an overwhelming amount of properly admitted evidence that showed beyond a reasonable doubt that Wasuge was in physical control of a motor vehicle while impaired to an appreciable degree by intoxicating liquor. Even if the trial court erred in admitting the State's expert testimony about BAC levels, that error was ultimately harmless. In addition, courts may consider relevant and objective evidence related to race and ethnicity when analyzing whether a defendant is in custody under the "totality of the circumstances" test for *Miranda* purposes. We affirm the Court of Appeals.

Whitener, J.

WE CONCUR.

Stephens, C.J.

Gordon McCloud, J.

Johnson, J.

Montoya-Lewis, J.

Madsen, J.

Mungia, J.

González, J.

Yu, J.P.T.