IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>           Respondent,<br><br>           v.<br><br>KYLE WAYNE RITTENHOUSE,<br><br>           Appellant. | No. 87273-7-I (consolidated with No. 87274-5-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Kyle Rittenhouse was convicted after a June 2024 jury trial of six counts of identity theft in the first degree, seven counts of identity theft in the second degree, and one count of organized retail theft in the first degree. The following month, Rittenhouse was convicted of one additional count of identity theft in the first degree following a second jury trial. In this consolidated appeal, he challenges the trial court's denial of his motions to suppress evidence under CrR 3.6 and motion to substitute counsel, and further asserts cumulative error necessitates reversal of his convictions. We disagree and affirm.

FACTS[1]

Kyle Rittenhouse was arrested on January 31, 2023, by officers with the Pierce County Sheriff's Department (PCSD) following an investigation into

---

[1] Unless otherwise noted, we rely on the unchallenged findings of fact entered by the trial court after the hearings on Rittenhouse's motions to suppress under CrR 3.6 and the State's CrR 3.5 motion. This is because unchallenged findings are verities on appeal. *State v. Acrey*, 148 Wn.2d 738, 745, 64 P.3d 594 (2003).

suspected identity theft and organized retail theft. The investigation by PCSD began on January 8 when Sarah Seay made an online report that "a newer model black Dodge [t]ruck with 4 doors accessed her mailbox, stole her credit card from the mail, activated it, and successfully used it at a Puyallup business." Seay provided photos of the truck to PCSD Deputy Casey McEathron, an investigator in the department's proactive property crimes unit. Seay also informed McEathron that the card had been used at a Home Depot. "McEathron called Home Depot loss prevention and obtained surveillance video and still shots of the individuals who completed the fraudulent transaction using Seay's information." The "transaction totaled $6,215.18."

With the help of a crime analyst, McEathron identified one of the people involved in the Home Depot transaction as Christopher Billings. McEathron then found a known former address for Billings and conducted surveillance of the residence. While McEathron observed the residence, he saw a "black [D]odge four-door pickup arrive at the house." McEathron later testified at a hearing on one of the motions at issue here that he recorded its license plate number from his vantage point on the street. McEathron conducted a database search for the truck's license plate and "learned it was either registered to or had been recently sold to Kyle Rittenhouse." McEathron recalled that he had previously arrested Rittenhouse, reviewed prior booking and Department of Licensing (DOL) photos, compared them to the video from Home Depot, and made a positive identification of Rittenhouse on that basis. While researching Rittenhouse, he identified Chelsie McDaniel as an associate of Rittenhouse's from past police reports. On this basis,

McEathron reviewed DOL and booking photos of McDaniel and also compared them to the Home Depot footage. From this information, McEathron identified McDaniel as the other person present with Rittenhouse during the Home Depot transaction.

On January 31, 2023, another deputy contacted McEathron after locating Rittenhouse's truck. McEathron and two other deputies proceeded to the location where they observed Rittenhouse's truck at the end of a residential driveway near the street. They watched Rittenhouse and his passenger, who was later identified as McDaniel, leave the residence in the black truck and deputies then moved to apprehend them. Rittenhouse and McDaniel were placed in handcuffs and deputies advised them of their rights.

After the arrest, McEathron sought and obtained a search warrant for Rittenhouse's truck. As a result of McEathron's preliminary investigation, the State filed its initial information in Pierce County Superior Court Cause No. 23-1-00331-6 (2023 case) on February 1 that charged Rittenhouse with one count of identity theft in the first degree for the theft and use of Seay's credit card, and one count of organized retail theft in the first degree based on the use of Seay's credit card to make the purchases at Home Depot. McEathron later testified at a pretrial evidentiary hearing, and similarly at trial, that the following items were seized pursuant to the search warrant:

> hundreds of pieces of mail, receipts, checks, identification cards with the defendants' pictures but the identifying information of other people, and notebooks containing the personal identifying information of others, including addresses and social security numbers.

On September 8, the State filed an amended information that added charges based on the checks and other evidence seized pursuant to the execution of the search warrant issued for Rittenhouse's truck. It included nine additional counts of identity theft in the first degree and eight counts of identity theft in the second degree.

On January 4, 2024, the State filed one count of identity theft in the first degree under Pierce County Superior Court Cause No. 24-1-00052-8 (2024 case), based on an incident involving the use of Joshua Robnett's DOL records and social security number to fraudulently obtain a driver license and various lines of credit. According to the probable cause affidavit filed with that information, January 23, 2023 footage from a Port Orchard Les Schwab showed a "person with an appearance and clothing consistent with defendant Rittenhouse making the purchase" of wheels that were installed on a "black Dodge Ram 1500," the same color, make, and model of a vehicle registered to Rittenhouse. The State further alleged that during the police contact on January 31, 2023, "Rittenhouse had new wheels on his Dodge Ram 1500 that matched the wheels purchased at Les Schwab using Mr. Robnett's name." Rittenhouse was represented by the same defense counsel in the 2024 case as in his 2023 case, but the cases proceeded separately.

On May 2, 2024, the court conducted a hearing to address Rittenhouse's concerns with his representation, which the trial judge initially understood as a desire to exercise his right to self-representation. Rittenhouse clarified his request as one regarding substitution of his appointed counsel based on a purported

- 4 -

conflict between them and explained his reasoning. The court concluded that the conflict did not necessitate substitution and denied the motion, and Rittenhouse agreed to some alternatives to resolving the difficulties as suggested by the court.

On May 17, 2024, through counsel, Rittenhouse filed a motion to suppress pursuant to CrR 3.6 in the 2023 case and asserted that McEathron "lacked reasonable suspicion upon which to detain Mr. Rittenhouse"; the argument focused solely on the propriety of the seizure and analyzed legal authority regarding investigatory stops. The State's response to the motion argued that Rittenhouse's initial seizure was justified by reasonable articulable suspicion that a crime had occurred and his arrest was based on probable cause. This was so, the State asserted, because "there was sufficient evidence that Mr. Rittenhouse and Ms. McDaniel used Ms. Seay's card to process a transaction in excess of $1,500" which provided "probable cause to arrest them on the charge of [i]dentity [t]heft in the [f]irst [d]egree." At the May 23 hearing on the CrR 3.6 motion, the State responded to Rittenhouse's framing of the issue and led with argument that McEathron had reasonable articulable suspicion to contact Rittenhouse pursuant to *Terry v. Ohio.*[2] However, the trial court directed the prosecutor to focus solely on the issue of probable cause and stated,

> We're really not talking about a *Terry* stop here. The officer's testimony was clear and the actions on the video are clear that they take him into custody. They don't officially tell them they're under arrest until they have them both in custody. But that's an arrest. It's a formal arrest, and the court is judging this based on whether they had probable cause to arrest based on the investigator's

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968). Such contact by law enforcement is commonly known as a "*Terry* stop" and is limited in scope as compared to other forms of interactions with law enforcement. *State v. Acrey*, 148 Wn.2d 738, 746-47, 64 P.3d 594 (2003).

investigation, his determination of probable cause. So I understand why you want to go there, but let's just stick with PC.

McEathron testified at the CrR 3.6 hearing and was extensively cross-examined by the defense. After considering argument from both parties, the trial judge ruled on the motion from the bench; the court expressly found that Rittenhouse's arrest was based on probable cause and, therefore, lawful, and denied the motion to suppress on that basis.[3] The trial court issued written findings of fact (FF) and conclusions of law (CL) after the conclusion of trial on June 24 that reflected its oral ruling.

The following day, June 25, Rittenhouse filed a pro se CrR 3.6 motion in the 2024 case, but the trial court denied it without a hearing. In its July 15 order on the motion, the court expressly found that the legal issues it raised had been "fully litigated" at the May 23 hearing on the CrR 3.6 motion in the 2023 case and the motion in the 2024 case did "not challenge whether there was sufficient probable cause to support the warrant that led to the search of [Rittenhouse's] truck" but, instead, only "focuse[d] on the lawfulness of the arrest" on January 31, 2023. The trial court determined that the June 25 motion was "without merit in fact or law" and "[a]n evidentiary hearing would not create merit for [Rittenhouse's] motion."

In the midst of the litigation regarding the various CrR 3.6 motions, Rittenhouse again raised the issue of substitution of counsel. The matter was heard on June 4 and Rittenhouse again claimed that conflict with counsel required substitution and maintained that he did not want to represent himself. The trial

---

[3] On May 24, one day after the hearing, Rittenhouse filed a pro se motion to suppress and to dismiss pursuant to CrR 3.6. As Rittenhouse was represented by counsel when he filed the motion and counsel did not endorse it, the court declined to consider it.

court provided Rittenhouse another opportunity to explain the conflict, and, when prompted by the court, Rittenhouse's counsel refuted the characterization of the attorney-client relationship. After the inquiry, the trial court denied the motion.

The 2023 case proceeded to trial in June 2024 and, after the trial court granted the State's motion to dismiss one of the counts of identity theft in the second with prejudice at the close of trial, the jury returned guilty verdicts on one count of organized retail theft in the first degree, six counts of identity theft in the first degree, one of which included an aggravating factor that it was a major economic offense, and seven counts of identity theft in the second degree. The jury acquitted Rittenhouse of the remaining four counts of identity theft in the first degree set out in the amended information. The court then set over sentencing to await the outcome of Rittenhouse's other pending matters.

Rittenhouse then proceeded to a jury trial on the 2024 case the following month. The jury convicted him as charged on the single count of identity theft in the first degree and found by special verdict that the State had proved the aggravating factor that the crime was a major economic offense. On August 23, the trial judge sentenced Rittenhouse on both the 2023 and 2024 cases. On the 2023 case, the judge imposed a total term of confinement of 113 months, including an exceptional sentence above the standard range for the count the jury had found to be a major economic offense, followed by a period of community custody. The judge then imposed 84 months in prison on the 2024 case, followed by 12 months of community custody. The judgment and sentence (J&S) entered in each case expressly directed that the terms of confinement were to run consecutively.

Rittenhouse timely appealed from the J&S entered in both cases to Division Two of this court. In September 2024, the chief judge of Division Two ordered transfer of the appeals to this division for resolution. After the transfer, in October 2024, Rittenhouse moved to consolidate his pending appeals, No. 87273-7-I and No. 87274-5-I, pursuant to RAP 3.3(b). The State did not file a response, and a commissioner of this division consolidated the cases.

ANALYSIS

Rittenhouse assigns error to the denial of both his May 17 and June 25 CrR 3.6 motions and challenges a number of findings and conclusions entered by the trial court pursuant to the resolution of those motions. He also contends that the trial court improperly denied his motions to substitute counsel. Before we proceed to the analysis regarding his various motions, we briefly address certain procedural deficits in Rittenhouse's appeal.

Across 14 separate assignments of error, Rittenhouse expressly challenges findings 29, 30, and 63 and conclusions of law 3 and 5 entered after the hearing on his May 17 CrR 3.6 motion, finding 34 entered in that same order regarding the State's motion to admit statements pursuant to CrR 3.5, and eight findings set out in the court's order on his June 25 CrR 3.6 motion. Despite explicitly identifying these numerous findings and conclusions, Rittenhouse fails to identify, much less apply, the relevant standard of review. Under RAP 10.3(a)(6), parties must provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." Rather, Rittenhouse merely argues suppression anew, but from a framework distinct from that which

he had presented in the trial court,[4] and does not specifically engage with the findings and conclusions he identified in assignments of error 2 through 7 and 11 through 18.

I.    Denial of CrR 3.6 Motions to Suppress

The suppression of "physical, oral or identification evidence" is governed by CrR 3.6. "In reviewing findings of fact on a motion to suppress, this court 'will review only those facts to which error has been assigned.'" *State v. Acrey*, 148 Wn.2d 738, 745, 64 P.3d 594 (2003) (internal quotation marks omitted) (quoting *State v. Kinzy,* 141 Wn.2d 373, 382, 5 P.3d 668 (2000)). If unchallenged by an appellant, findings of fact are treated as verities on appeal. *Id.* "When reviewing the denial of a CrR 3.6 suppression motion, we review the trial court's findings of fact for substantial evidence and its conclusions of law de novo." *State v. Derri*, 199 Wn.2d 658, 676, 511 P.3d 1267 (2022). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009) (quoting *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999). We "review de novo the legal conclusion of law whether probable cause is established." *State v. Chamberlin*, 161 Wn.2d 30, 40, 162 P.3d 389 (2007).

---

[4] The primary issue presented in his May 17 motion was whether "McEathron unlawfully detained Mr. Rittenhouse when he *lacked reasonable suspicion* that Mr. Rittenhouse had committed a crime." (Emphasis added.)

However, on appeal, his primary contention is that McEathron "*lacked probable cause* to believe that Mr. Rittenhouse was involved in the Home Depot transaction." (Emphasis added) (boldface omitted). This tracks the trial court's reasoning in its denial of the motion.

The state constitution mandates that "[n]o person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." WASH. CONST. art. 1, § 7. "Article I, section 7 of our state constitution grants greater protection to individual privacy rights than the Fourth Amendment." *State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009); U.S. CONST. amend. IV. Without a valid exception, "warrantless searches and seizures are per se unreasonable" and violate the state and federal constitutions. *State v. Martin*, 14 Wn. App. 2d 425, 430, 465 P.3d 368 (2020). One such exception is the warrantless investigative stop. *See Terry v. Ohio*, 392 U.S. 1 (1968). "A *Terry* stop is justified if an officer can articulate a reasonable suspicion that the person stopped has been or is about to be involved in criminal activity." *State v. Johnson*, 8 Wn. App. 2d 728, 746, 440 P.3d 1032 (2019).

Alternatively, a warrantless arrest may be permissible if the officer has developed probable cause that the arrestee has committed a crime. "Under both the federal and state constitutions, probable cause is the objective standard by which the reasonableness of an arrest is measured." *State v. Huff*, 64 Wn. App. 641, 646, 826 P.2d 698 (1992). "Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been committed." *State v. Wagner-Bennett*, 148 Wn. App. 538, 541, 200 P.3d 739 (2009).

"[T]he exclusionary rule generally requires that evidence obtained from an illegal search and seizure be suppressed." *State v. Betancourth*, 190 Wn.2d 357,

364, 413 P.3d 566 (2018). "Despite the broad application of our exclusionary rule, we have long recognized that the exclusionary rule applies only to the so-called 'fruit of the poisonous tree,' that is, evidence obtained as a direct or indirect result of an article I, section 7 violation." *State v. Mayfield*, 192 Wn.2d 871, 888-89, 434 P.3d 58 (2019).

A.      May 17 Motion Filed by Counsel in 2023 Case

Rittenhouse challenges only the following findings of fact and conclusions of law entered by the trial court on June 24 after the hearing on his May 17 CrR 3.6 motion to suppress:

[FF] 29.    Deputy McEathron reviewed prior booking and Department of Licensing photographs and compared them to the Home Depot video, ultimately determining the second male was Kyle Rittenhouse.

[FF] 30.    Deputy McEathron was able to positively identify Kyle Rittenhouse in the Home Depot video based on his stature, haircut, and facial features.

[FF] 63.    After the initial conversation, Rittenhouse reinitiated a conversation with Deputy McEathron, admitting that he was one of the three individuals in the Home Depot [v]ideo, but he indicated McDaniel had no part in it.

[CL] 3.     Once Deputy McEathron was able to positively identify Kyle Rittenhouse and Chelsie McDaniel from the Home Depot video based on their prior booking and Department of Licensing photographs, Deputy McEathron had probable cause to arrest each of them for identity theft.

[CL] 5.     Rittenhouse and McDaniel were lawfully arrested at the address off of 224th Street E, as their arrests were based on probable cause.

Again, Rittenhouse does not offer any argument in briefing that any of the above findings of fact are not supported by substantial evidence.

As reflected in the trial court's findings, McEathron testified at the May 23 CrR 3.6 hearing regarding the steps he took in order to identify Rittenhouse as the suspect in the identity theft allegation as to Seay. The trial court expressly found McEathron's testimony to be credible, though that determination was erroneously titled as conclusion of law 1. However, we review findings and conclusions based on their substance, not how they are labelled. *See State v. Gaines*, 122 Wn.2d 502, 508, 859 P.2d 36 (1993). Further, we will not review the trial court's credibility determinations. *State v. McComas*, 186 Wn. App. 307, 319, 345 P.3d 36 (2015).

Critical to our review here, McEathron specifically testified to the steps of his investigation set out in the challenged findings, *supra*, and the court found that testimony credible. Because such credible testimony is sufficient for a fair-minded person to be persuaded as to "the truth of the stated premise," findings 29, 30, and 63 are supported by substantial evidence. These findings alone are adequate for us to conclude that there was probable cause to arrest Rittenhouse, but the additional findings he failed to challenge on appeal bolster that conclusion even further.

First, FF 12, 16, and 20 establish that Seay described a truck similar to that registered to Rittenhouse as the vehicle involved in the theft of her credit card from her mailbox on January 8. Then, FF 12-15 and 20 set out that when that card was used to make a $6,215.18 purchase at Home Depot, someone who McEathron would later identify as Rittenhouse was present and a similar truck was in the parking lot. Next, FF 22-27 show that after Billings was identified in the Home Depot video and McEathron located his address in law enforcement databases,

Rittenhouse's truck was observed outside of Billings' address by law enforcement. FF 12, 20, and 23-27 support that McEathron researched the license plate number on the truck that returned as registered to Rittenhouse based on the connection between Billings, the black truck, and the Home Depot incident. FF 28-30 establish that it was at that point when McEathron recalled his prior arrest of Rittenhouse and conducted his search of Rittenhouse's DOL and booking photos for purposes of identification and verification that Rittenhouse was one of the people in the Home Depot security images. Taken together, this was ample "reasonably trustworthy information"[5] to support McEathron's determination that Rittenhouse had committed the crime of identity theft in the first degree. Further, because there was probable cause sufficient to arrest Rittenhouse for that crime, neither the subsequent seizure of his truck nor pursuit of a search warrant on the vehicle was tainted and any evidence seized in the execution of the search warrant was not fruit of the poisonous tree. Accordingly, CL 3 and 5 logically flow from the trial court's findings, both challenged and not, and denial of the May 17 CrR 3.6 motion was proper.

### B. June 25 Pro Se Motion Decided Without Hearing in 2024 Case

Next Rittenhouse assigns error to the trial court's handling of his June 25 CrR 3.6 motion that he filed pro se in the 2024 case and contends he "was not afforded a meaningful opportunity to be heard because the court found that the motion was meritless and did not permit Mr. Rittenhouse to call witnesses or

---

[5] *See Wagner-Bennett*, 148 Wn. App. at 541.

present evidence in his defense." He further argues the merits of the trial court's ruling that denied the motion. We disagree on both points.

We review the application of a court rule to a particular set of facts de novo. *State v. Conwell*, 141 Wn.2d 901, 906, 10 P.3d 1056 (2000). CrR 3.6(a) expressly vests the trial court with discretion regarding hearings on the suppression of evidence: "The court shall determine whether an evidentiary hearing is required based upon the moving papers. If the court determines that no evidentiary hearing is required, the court shall enter a written order setting forth its reasons."

Here, the trial court complied with the rule when it entered an order explaining why a second hearing would not be held on Rittenhouse's June 25 CrR 3.6 motion that sought to suppress the same evidence, based on the same investigation and January 31, 2023 arrest by law enforcement, that had been ruled on only a day prior. Rittenhouse challenges, in whole or part, what he identifies in his assignments of error as findings of fact but are actually a combination of findings of fact and conclusions of law, entered in the trial court's July 15 order on the motion. They are:

> [FF] 3. The seizure of the defendant's truck on [January 31, 2023] was also the subject of a Cr.R. 3.6 motion fully litigated in this [c]ourt under Cause No. 23-1-00331-6. The defense motion to suppress in that case was denied.
>
> [CL] 5. On January 31, 2023, law enforcement officers had probable cause to arrest the defendant for the crime of [i]dentity [t]heft.
>
> [CL] 6. To contact the defendant, the officers used a normal path of ingress and egress.
>
> [CL] 8. As law enforcement officer[s] had probable cause to arrest the defendant, they were lawfully on the property.

[CL] 9.     The defendant[6] [sic] lawfully seized the defendant.

[CL] 12.    As law enforcement lawfully arrested the defendant on January 31, 2023, no further evidentiary hearing is required.

[CL] 13.    The defense motion is without merit in fact or law.  An evidentiary hearing would not create merit for the defendant's motion.

Again, as with his assignment of error regarding the findings and conclusions entered on June 24 pursuant to the trial court's ruling on his May 17 CrR 3.6 motion, Rittenhouse's argument on these challenges effectively relitigates whether McEathron had probable cause to arrest him on January 31, 2023 such that suppression of evidence resulting from that arrest was required.  With regard to the trial court's determination that the June 25 motion could be resolved without a hearing, Rittenhouse argues that decision violated his right to due process[7] but concedes that "the requirements of due process are somewhat malleable" and fails to engage with the plain text of CrR 3.6 that authorizes the precise action at issue here.

FF 3 is plainly supported not only by the record on appeal transmitted to this court on the 2023 case which include the report of proceedings and various pleadings and orders in the clerk's papers related to or issuing from the May 23,

---

[6] Rittenhouse accepts that this is a scrivener's error and also that the court's intent was to conclude that *the involved deputies* "lawfully seized the defendant."  This is established by the phrasing of his assignment of error 17, which states, "The trial court erred by finding the *police* lawfully arrested Mr. Rittenhouse . . . ."  (Emphasis added.)

[7] While Rittenhouse makes an express due process claim in his opening brief, and offers some controlling authority in support of that challenge, he does not engage in any analysis of how the trial court's compliance with the *plain language of the rule* denied him the process due to him, nor does he present a due process challenge to CrR 3.6 itself.  Accordingly, Rittenhouse's due process argument has been abandoned.

2024 hearing conducted on the May 17 CrR 3.6 motion, but Rittenhouse has necessarily conceded as such given his extensive briefing that challenges that very motion and corresponding ruling. For all of the reasons set out in our analysis in Section I.A, *supra*, CL 5-9 and 12-13 logically flow from the other unchallenged findings set out in the July 15 order that denied Rittenhouse's June 25 CrR 3.6 motion. Further, and crucially, Rittenhouse fails to identify what evidence, if any, he would have been able to adduce had the trial court conducted an evidentiary hearing on the June 25 motion, much less how it would have resulted in a different ruling. Accordingly, he has failed to demonstrate error both as to the trial court's decision not to conduct an additional hearing and its ultimate resolution of the legal issue presented in the June 25 CrR 3.6 motion.

II.     Denial of Motion for New Counsel

Rittenhouse further contends that the trial court erred when it denied his motion to substitute counsel in the 2023 case because it failed to conduct an adequate inquiry into his asserted conflict with his assigned attorney.[8] We disagree.

An accused person's right to counsel is constitutionally protected. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. "We review a trial court's decision on a motion to substitute counsel for an abuse of discretion." *State v. Kitt*, 9 Wn.

---

[8] Rittenhouse also notes in briefing that he suggested in the trial court that should counsel decline to file the CrR 3.6 motion he wished to present, he "would have to proceed pro se" and characterizes that as a secondary remedy in the context of his motion to substitute counsel. He then identifies portions of the record where the trial court advised him as to his rights and responsibilities regarding self-representation.

However, Rittenhouse presents no authority or argument about a trial court's ruling on a motion to exercise that distinct right, and, as such, we need not engage in that separate analysis.

App. 2d 235, 243, 442 P.3d 1280 (2019). "A criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997). "Counsel and defendant must be at such odds as to prevent presentation of an adequate defense. The defendant may not rely on a general loss of confidence or trust alone to justify appointment of a substitute new counsel." *State v. Schaller*, 143 Wn. App. 258, 268, 177 P.3d 1139 (2007) (footnote omitted). The trial court considers "(1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings." *Stenson*, 132 Wn.2d at 734; *State v. Cross*, 156 Wn.2d 580, 607, 132 P.3d 80 (2006), *abrogated on other grounds by State v. Gregory,* 192 Wn.2d 1, 427 P.3d 621 (2018).

Rittenhouse's first motion for new counsel was presented to the court orally on May 2, 2024. Another defense attorney who was standing in at the hearing for Rittenhouse's assigned attorney affirmatively stated, "[I]t's my understanding this morning that Mr. Rittenhouse has a motion to change counsel. He is requesting another attorney be assigned to his case." The court then stated, "My understanding from what I heard last week was that, Mr. Rittenhouse, you were seeking to represent yourself[,] to go pro se. Is that not the case?" Rittenhouse answered in the negative and, when asked by the court whether he wanted to waive his right to counsel, answered, "No, not at all." After the court advised him of his rights, and the relevant limitations, with regard to assigned counsel as

compared to retained counsel, Rittenhouse explained his dissatisfaction with his assigned attorney as follows:

> Okay. So ever since I got him, he literally tells me to fire him. He's not working for me. He belittles me every step of the way. There's no question there. He literally tells me to fire him every time I see him, for I don't know what reason, and he—literally, everything I talk to him, goes, literally, because I said about a [CrR] 3.6 motion. He says that's against his morals or something like that, and he's—he literally tells me to fire him every time I see him, and that's not something I've ever had a lawyer do to me and it's not right.

Because Rittenhouse's assigned attorney, John Austin, was not present that day, the court asked the attorney covering for Austin, Megan Dunn, if she was "aware of any potential conflicts that ha[d] arisen," and she answered, "[A]t this time, no." The court then allowed Rittenhouse to continue:

> I wrote the pro se people on the thing. I wrote . . . that one place, pretrial services, asking them, telling them what's going on, because I don't know what to do. I don't know what—it's been going on since clearly the first day I met him, and literally, I feel like they—I think he's just literally lying to my face. And I'm not—I'm telling him, like, things, and he's literally telling me—literally lying to me and he says he has 25 years' experience.
>
> And I show him black and white that he's lying to me to my face and says, well, I don't care. I'm not going to do nothing for you. I don't think—you know, he's literally telling me that—just fire me, just fire me—ever since I got him, and that's literally what he tells me. I just don't know what to do, and he's not in my best interest, hundred percent. He literally hired somebody to lie to me.
>
> THE COURT: Okay. so, again, because I don't have anything in front of me that there is a conflict such that the representation cannot continue, I don't have the authority to replace appointed counsel.
>
> [RITTENHOUSE]: So he told me he wasn't going to put in a 3.6. I told him if that's the case and I can't put in a 3.6 unless I fire him and go pro se, that's what I want to do. If that's what's going on, and that's—I need counsel. I do need counsel. But if the fact that he refuses to do it when that's what's necessary for my case, I—I'm going to do whatever it takes. And I have to put this motion in

because this is what—this is what is supposed to be done for my case and for him. He told me he refuses to do it, even though it's what's recommended for my case. Then whatever I have to do to be able to put this in is what I'm going to do.

The trial judge then advised Rittenhouse of the risks and responsibilities of exercising his right to self-representation. After doing so, the court proposed an alternative in the following exchange:

THE COURT: . . . I think, what I can do is ask Ms. Dunn to talk to Mr. Austin about what happened here today and suggest that perhaps Mr. Austin can speak to somebody in his office about whether your case should be reassigned to someone else. That's—that's as far as I'm willing to go. I think that's as far as I can go, to be honest with you.

[RITTENHOUSE]: All right.

THE COURT: So let me ask you again, do you wish to represent yourself, or do you wish to take the time to see if this conflict can be resolved?

[RITTENHOUSE]: Take the time to make sure this conflict can be resolved.

THE COURT: Okay. All right. That's fine.

[RITTENHOUSE]: Thank you.

On June 4, Austin advised the court that Rittenhouse had expressed "that it was his intent to request to move the [c]ourt to allow him to proceed pro se" and, on that basis, Austin had contacted the court the day before to set the hearing for that purpose. Rittenhouse then addressed the court as follows:

[RITTENHOUSE]: I believe that I have—I don't know. I just have the right to see my discovery and I have a right to make decisions in my case, and I believe that I have not been given the right to that, and—

THE COURT: Which part?

- 19 -

[RITTENHOUSE]: To the part where I need to see my discovery before my trial. I get to see what I'm up against before taking it, and I have the right to conflict-free counsel or conflict-free attorney provided to me. Even though it's indigent, I believe that I do deserve conflict-free trial, and I have not had that. I have not had that whatsoever since the moment I was assigned to John Austin.

THE COURT: Okay. This sounds like, and *we've talked about this once before when we were up, in my courtroom, that you're unhappy with counsel, not necessarily that—unhappy with your appointed counsel, not necessarily that you want to proceed pro se. Am I getting that right?*

[RITTENHOUSE]: Your Honor, last time we spoke, that it was to see if I could work things out with my attorney. Nothing has changed since that last termination, or nothing has changed since that last remark.

THE COURT: Okay. I understand that's what you're saying. This is what I'm asking you, though. Please listen to my question, okay? *Are you here this morning because you are dissatisfied with Mr. Austin's representation, or are you here this morning because you have decided that you want to represent yourself, absent any attorney? You see the difference?*

[RITTENHOUSE]: No. Yes. No, I do not want to represent myself.

THE COURT: Okay. Okay.

[RITTENHOUSE]: Completely by myself, no, I don't. I'm not ready for that, Your Honor.

THE COURT: And I totally understand. And that's your choice, and I think you're making a good decision, okay?
So, this is what—I think I mentioned this to you before, but I want to make sure that you understand this. So you do have, actually, a constitutional right to counsel of your choice if you are privately retaining that counsel. So in other words, if you could afford to do so, you could go out in the community and hire anybody you want, and that's—the [c]ourt doesn't step into the way of that decision of yours, okay?
The difference is, when you are appointed counsel, you don't have a constitutional right to who your appointed counsel is. You see the difference?

[RITTENHOUSE]: Yes, Your Honor.

THE COURT: Okay. As I indicated before, and I think we discussed this, is this is a somewhat complicated case from the standpoint of what it is the prosecution has to prove to the jury, and so you want a lawyer representing you of some experience, which Mr. Austin is. Mr. Austin has practiced in front of me before. I also know him from when I was a practicing criminal defense attorney, and so I have complete confidence in his ability to represent you.

*You mention that you want counsel that's conflict-free. I am not aware of any conflict that exists in this case. Can you enlighten me?*

[RITTENHOUSE]: As of last time I spoke, I brought this to your attention. I've yet to be able to see my discovery. I've yet to be able to speak with him about any part of my case, and it's more along the lines of a bicker back and forth that's not professional, and the fact that, I mean, I still have yet to see any of my discovery, and yet, the— how do I say it? He's told me frivolous things that . . . me, uneducated as a—not as a attorney, would know that was not true. He would tell me things, you know, that's not—that's obviously not true in regards to, you know, he's not in my best interest, I believe. That—just like as the last motion, the *Terry* stop motion, everyone knew this wasn't a Terry stop, and he took—and he knew this and he did this, and I feel like he did this intentionally to—because I don't know. He just doesn't—I feel like he did it intentionally, honestly.

THE COURT: Okay. Well, this is what I can tell you about the motions that I've already ruled on. The motions did have both factual and legal merit. The reason you can tell that is because I granted an evidentiary hearing. What the rule stipulates is that it's at the discretion of the [c]ourt to allow an evidentiary hearing, and I don't do that unless there is both factual and legal merit to the motion. So I would tend to disagree with you there.

Let me ask Mr. Austin, Mr. Austin, are you satisfied that you've provided complete discovery to Mr. Rittenhouse.

MR. AUSTIN: Yes, Your Honor. We have retained the services of Tessa Larican, investigator in our office, to review, and she's kept copious notes on her contacts with Mr. Rittenhouse and his review of the discovery.

THE COURT: Okay. All right. I don't—the defendant's not seeking to represent himself. He's been unequivocal about that, and so I'm not going to take any further action at this point. My—

MR. AUSTIN: I apologize for interrupting. I wanted to let the court know, after the last motion of this sort from Mr. Rittenhouse, Ms. Dunn came back to the office and she advised me that the court suggested that perhaps I speak to my supervisor, Laura Carnell, who's the head of the felony division of the Department of Assigned counsel about the prospects of reassigning Mr. Rittenhouse to another attorney with the Department of Assigned counsel.

THE COURT: That's not actually what I said. What I said was, at the time, is that if Mr. Austin feels that it would be in the interests of a smoother path, then he may choose to do that, but we're not doing that two days before trial starts.

MR. AUSTIN: I'll just let the [c]ourt know that I had that conversation a few weeks ago, and Ms. Carnell opted not to exercise that action. As such, I'm prepared to go to trial on Thursday.

THE COURT: All right. I don't have an unequivocal request to represent himself, so I'm not going to take any further action.

On the issue with respect to conflict with his current defense attorney, again, the [c]ourt doesn't have the ability to change attorneys, at least at this point. We're set for trial on Thursday, and I expect we are going to start on Thursday morning.

(Emphasis added.)

After presenting relevant authority and summarizing the above procedural history, Rittenhouse simply, and somewhat incredulously, asserts in briefing that "[h]ere, the trial court made almost no inquiry." This is plainly belied by the record quoted at length *supra*. While he mentions in camera inquiry, such a step is by no means a requirement to support a conclusion on appeal that the trial court's examination of this issue was sufficient. Again, *Stenson* directs that our analysis is whether the trial court properly considered "(1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings." 132 Wn.2d at 734. The trial court plainly met this standard here.

Rittenhouse was given ample opportunity to explain his grievances with Austin on two separate occasions, guided by specific questions from the trial court that focused the inquiry to follow the controlling authority. While Rittenhouse relies on cases where the trial court abused its discretion due to clearly inadequate inquiry into the accused's concerns about counsel, he fails to persuasively establish factual similarity to the record before us. The trial court was obviously aware of the controlling standard as it clarified as much to Rittenhouse repeatedly, including noting that he would enjoy the choice of retained counsel but that was not a right he had as to appointed counsel. The judge inquired more than once about whether communication had broken down and even asked coverage counsel if she was aware of any legal conflicts between Rittenhouse and Austin. Rittenhouse has failed to establish that the court's inquiry here was insufficient or that the court otherwise abused its discretion when it denied his motions to substitute counsel.

III.     Cumulative Error

Finally, Rittenhouse contends that even if his other assignments of error do not independently require reversal, the cumulative effect of such error prevented him from having a fair trial such that it presents a separate basis for reversal. We disagree.

"Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 W.2d 741, 766, 278 P.3d 653 (2012). "[T]he defendant must show that the combined effect of multiple errors requires a new trial." *State v. Cecil*, 34

Wn. App. 2d 569, 594, 571 P.3d 1255 (2025).  Because the trial court did not err when it denied Rittenhouse's motions to suppress or his motion to substitute counsel, there are no errors to accumulate, and this doctrine does not apply.

Affirmed.

WE CONCUR: